[Nos. C062191, C063545. Third Dist. Aug. 12, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN RUSSELL SMITH, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II and IV.

**COUNSEL**

Victoria H. Stafford, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Larenda Delaini, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**NICHOLSON, J.**—Defendant was convicted by jury of molesting a victim from the time she was eight years old until she turned 15. Sentenced to 18 years in state prison, he appeals.

On appeal, defendant raises issues concerning (1) the statute of limitations, (2) jury instructions, (3) restitution, and (4) sentencing. Except for the need to make some minor modifications to the judgment, we find no merit in defendant's contentions of error. We therefore modify and affirm the judgment.

## PROCEDURE

The district attorney charged defendant by information with one count of committing a lewd act on a child under 14 (count I; committed between Jan.

1, 1987, and Aug. 10, 1988; Pen. Code, § 288, subd. (a))[1] and one count of continuous sexual abuse (count II; committed between Aug. 11, 1988, and Aug. 9, 1993; § 288.5). A jury found defendant guilty of both counts.

The trial court sentenced defendant to the upper term of 16 years in state prison on the continuous sexual abuse count and a consecutive two years (one-third the middle term) on the lewd act count, for a total state prison term of 18 years. The court also ordered various fines and fees, as well as victim restitution in an amount to be determined later.

Defendant filed a timely notice of appeal from the judgment. (Case No. C062191.)

After a hearing on the amount of victim restitution, the trial court ordered defendant to pay the victim $753,265, consisting of $3,265 in economic damages and $750,000 in noneconomic damages. The court noted that a total of $79,210.68 had been lodged with the court on behalf of defendant. The court ordered that the funds lodged with the court, including interest accrued, be distributed to the victim. The court also issued an abstract of judgment and writ of execution for the total amount of restitution ($753,265).

Defendant filed a timely notice of appeal from the restitution order. (Case No. C063545.)

We consolidated the two appeals.

FACTS

The victim, Jane Doe, was born on August 10, 1979. She met defendant at the age of eight, in 1988, when he started dating her mother. Doe's mother and defendant were married in 1992 and divorced in 2000.

When Doe was eight years old, defendant routinely babysat her at his trailer while Doe's mother worked. Dropped off at defendant's trailer after school, Doe would stay with defendant until Doe's mother picked her up in the evening. During Doe's visits to defendant's trailer, defendant would lift her onto the kitchen counter and touch Doe's chest, stomach, neck, and back, over and under her clothing, eventually doing so when Doe was wearing her underwear only. Defendant also digitally penetrated Doe's vagina when she was eight years old.

---

[1] Hereafter, unspecified code citations are to the Penal Code.

The molestation continued after Doe turned nine years old and beyond. As Doe recalls, "[b]asically every day" when she was alone with defendant, she was molested. He had her take off all of her clothes, and he touched her, grabbing her waist, stomach, and chest.

Doe moved into an apartment with her mother and defendant when she was 10 years old, and the molestations continued there, during the day, when Doe was alone with defendant. When she was 12 years old, defendant began digitally penetrating her vagina regularly.

Doe started homeschooling when she was 11 years old and continued with homeschooling through high school. The homeschooling was defendant's idea, and defendant was responsible for her during school time.

When Doe was 13 years old, she and her mother moved with defendant to a home in Ione. Doe's mother slept in the master bedroom, and defendant slept on a cot in the living room. As Doe grew through puberty, defendant focused more on her chest. Defendant routinely had Doe join him on the cot at night, both undressed. He touched her chest, buttocks, and vagina, while he had her touch his chest and stomach.

When Doe was 14 years old, defendant began orally copulating Doe, and, when Doe was 16 years old, defendant began penetrating Doe's vagina with his penis, which occurred almost every day. During a trip to Disneyland to celebrate Doe's graduation from high school, defendant had Doe orally copulate him while Doe's mother slept in the other bed.

Defendant took more than 800 naked pictures of Doe while she was a minor, starting when she was eight years old. He commonly destroyed the pictures after two or three weeks so that he would not get caught with them. One of the pictures, however, was found by defendant's sister. It was admitted as evidence at trial.

After Doe turned 18 years old, she moved out of the house. However, defendant frequently visited her and had sexual relations with her. When Doe needed money, defendant paid her for sex acts. The encounters continued until November 2005, when Doe was 26 years old.

Defendant lived with his father from 1997 until about the time of his arrest. He sent pictures of Doe to Playboy and encouraged her to become a stripper.

When defendant's sister was cleaning up their father's house after his death, she found a naked picture of Doe and a printout of a Yahoo profile of a 15 year old. On the back of the printout was written, "moms with daughters lesbian chat room."

In March 2006, Doe reported defendant's conduct to the El Dorado County Sheriff's Department. She told a detective, however, that defendant had never penetrated her vagina with his fingers or penis. At trial, she testified that she lied concerning this specific point because she "was not prepared to recollect the whole entire truth . . . ."

With the help of the detective, Doe made a pretext call to defendant. During the call, Doe told defendant she needed to talk to him because she had to deal with "some of the stuff that you did to me . . . ." Doe said: "I just want to know why you did some of the stuff you did to me in the past when I was a child." Defendant responded: "I don't know what to say at this point." Defendant was evasive, so Doe said that he needed to talk to her or she would go to the authorities. Defendant said: "[W]hat's going to say you're not going to go anyhow?" Defendant expressed discomfort with talking over the phone and said: "I just want to assure that it's just you and me talking." He wanted to be sure that their conversation was not being recorded.

Doe asked defendant, "Why did you start touching me when I was eight years old sexually and when I was a child and I didn't know what the hell was going on?" Defendant replied: "I don't know. It's probably not what you want to hear, but I don't know." Doe asked why defendant had sexual intercourse with her, and defendant said he thought it sounded like she was reading from a paper. Doe again asked why defendant had done "things" to her, and defendant answered: "Well, I didn't try to take advantage of you if that's what you're trying to say."

Doe asked defendant why he had tried to have sex with her and why he touched her chest and orally copulated her. Defendant said: "There's no explanation for anything that I can come up with right this instant. Or any other time." Doe persisted in seeking an explanation, and defendant expressed further suspicion that she was being prompted.

Doe accused defendant of touching her with sexual intentions, and defendant said: "Well, I didn't have sexual intentions with you, if that's what you're saying. I don't—there's no way in heck I did." Doe pressed for an answer, and defendant continued to say he did not have an answer. He also continued

to express his paranoia over talking to her about it on the phone and what he perceived as Doe's attempt to "entrap" him. He told Doe that he did not want her to go to the authorities because "it should be between you, me, and your mother, because your mother was right there too."

Doe asked: "Why did you touch my chest? Why did you touch my vagina? Why did you have attempted intercourse with me? Why did you . . . have any sexual contact with me?" And defendant said: "I—I don't know why—uh— why anything would come up on that. There was—there's no explanation for any of it other than the fact that we were living together and, you know, your mother and I and you, all three of us ran around in—well, we probably shouldn't have either—very open." He continued: "And unfortunately, you know, a lot of stuff started when your mother and I were first together, and I guess it just progressed, but it shouldn't have been."

Defendant said he was trying not to be attracted to Doe; he was attracted to her mother. Doe asked why he came to her, and defendant said: "I guess because you and I were getting closer overall."

Doe told defendant that she was worried that defendant would do those things to her future children. He said: "Never. Absolutely never." He also said, "I won't do it to anybody. I have never done it to anybody, and I tried to do is raise a daughter [*sic*], and I guess that was wrong too, right?"

Doe asked why he had touched her "in certain spots that you're not supposed to touch me as a father." Defendant said: "I don't know. There's no answers to anything. I don't know what to say to you. I'm sorry your life has been so screwed up, whether it was my fault, [Doe's boyfriend's] fault, or your mother's, or anybody else's."

Defendant told Doe: "Well, I'm sorry whatever (inaudible) happens happened [*sic*]. I don't have an actual answer for you because I don't know what to say to you, or anybody else. I just don't know. I just wish you could do what you're saying, close this thing off and go on with your life."

Before they hung up, defendant told Doe that he was dating a woman without children, and that he had purposely found someone without children.

The prosecution presented evidence of defendant's conduct with other girls. Around 1989, when defendant was married to a woman other than

Doe's mother, he fondled the breasts of his teenage stepdaughter over her clothing. On another occasion, defendant, in the presence of friends and family, made sexual remarks about the same stepdaughter, who was wearing a bikini.

In 2004, defendant gave a computer disk to his fiancée. He told her that he was being investigated and that the disk contained naked pictures of Doe which he had taken when, as an adult, she was trying to become a pole dancer. The fiancée never looked at the pictures and later destroyed the disk.

The fiancée ended her relationship with defendant when she learned that defendant had entered her home and tried to get into the bathroom when her 16-year-old daughter was showering.

Defendant testified at trial. He denied that he babysat Doe before they moved to Ione. He also denied that he ever molested Doe. Any touching between them was incidental and without sexual intent. However, he said that Doe hugged him when she was naked. He was shown one naked picture of Doe and was asked if he had taken the picture. He said no. He also denied paying her for sex.

Concerning the pretext call, defendant claimed he did not deny her accusations because he was trying to figure out what was going on. While defendant was being questioned by a detective about the accusations, defendant asked to speak to his father. In the interview room, defendant's father asked defendant where the conduct occurred, and defendant replied that it occurred in Placerville and Ione. Referring to the recording of the pretext call, defendant told his father: "If they run that tape, it's going to screw me down."

## DISCUSSION

### I

### *Statute of Limitations*

■ The standard statute of limitations for count I, a violation of section 288, subdivision (a), is six years because it falls within the category of crimes punishable by imprisonment for eight or more years.[2] (§ 800.) Here, the prosecution commenced more than six years after the alleged offense. (See

---

[2] "Except as provided in Section 799, prosecution for an offense punishable by imprisonment in the state prison for eight years or more shall be commenced within six years after commission of the offense." (§ 800.)

§ 804.) However, section 803, subdivision (f) provides for extension of the statute of limitations under specific circumstances. Defendant contends that (A) section 803, subdivision (f) does not apply in this case and (B) trial counsel was ineffective for not requesting a jury instruction on section 803, subdivision (f). We conclude that (A) the evidence produced at trial was sufficient to establish that the limitations period had not expired when this action was commenced against defendant and (B) defendant suffered no prejudice from any alleged deficiency in trial counsel's representation as to this issue.

Defendant did not raise the statute of limitations issue in the trial court. Neither did he request instructions so that the jury could make factual findings relevant to the statute of limitations. The failure to raise the statute of limitations issue did not forfeit consideration of the issue on appeal because the issue is jurisdictional and the charging document indicates on its face that the action is time-barred. (*People v. Williams* (1999) 21 Cal.4th 335, 340–341 [87 Cal.Rptr.2d 412, 981 P.2d 42].) However, because defendant did not request jury instructions on the statute of limitations issues, he cannot argue on appeal that jury instructions should have been given. (*People v. Smith* (2002) 98 Cal.App.4th 1182, 1192–1193 [120 Cal.Rptr.2d 185].)

Enacted effective January 1, 1994, section 803, subdivision (f)(1), states: "Notwithstanding any other limitation of time described in this chapter, a criminal complaint may be filed within one year of the date of a report to a California law enforcement agency by a person of any age alleging that he or she, while under the age of 18 years, was the victim of a crime described in Section . . . 288 . . . ."[3] Thus, this law extends the applicable statute of limitations for specified crimes, so long as the crimes "were not time-barred on January 1, 1994 . . . ." (*People v. Vasquez* (2004) 118 Cal.App.4th 501, 504 [13 Cal.Rptr.3d 162]; see also *Stogner v. California* (2003) 539 U.S. 607, 618–619 [156 L.Ed.2d 544, 556, 123 S.Ct. 2446] (*Stogner*) [§ 803, subd. (f) may extend limitations period only if limitations period had not yet expired when that provision became effective, applying ex post facto prohibition].)

Here, there is no *Stogner* ex post facto problem with applying the extension provision. Even though the information alleged acts before January 1, 1988 (six years before the Jan. 1, 1994, enactment of the extension

---

[3] Section 803, subdivision (f) was previously codified as subdivision (g) and is referred to as section 803, subdivision (g) in several cases discussed in this section. We will nonetheless refer to the current statute because the changes that have been made to the statute do not affect the issues in this case.

provision), the evidence at trial established that defendant did not meet Doe until sometime in 1988, when defendant started dating Doe's mother.

Section 803, subdivision (f) imposed three additional conditions that must be met before the statute of limitations can be extended. They are "(A) The limitation period specified in Section 800 . . . has expired. [¶] (B) The crime involved substantial sexual conduct, as described in subdivision (b) of Section 1203.066, excluding masturbation that is not mutual. [¶] (C) There is independent evidence that corroborates the victim's allegation. If the victim was 21 years of age or older at the time of the report, the independent evidence shall clearly and convincingly corroborate the victim's allegation." (§ 803, subd. (f)(2).) Concerning the corroboration requirement, "[n]o evidence may be used to corroborate the victim's allegation that otherwise would be inadmissible during trial. Independent evidence does not include the opinions of mental health professionals." (§ 803, subd. (f)(3).)

Here, the complaint, on its face, indicates that the prosecution for the crime charged in count I is time-barred because, as the parties agree, the limitations period for the crime was six years (§ 800) and more than six years elapsed between the alleged commission of the offense and the filing of the complaint. The information alleged, in count I, that defendant committed a lewd act on Doe between January 1, 1987, and August 10, 1988. Therefore, absent extension of the limitations period pursuant to section 803, subdivision (f), which is not shown on the face of the information, the six-year limitations period ended August 10, 1994, long before defendant was charged in this case.

Doe turned nine years old on August 10, 1988, the ending date of the crime alleged in count I. Therefore, the evidence concerning what defendant did when Doe was eight years old is the only evidence relevant to this inquiry.

A. *Conditions for Extending Limitations Period*

"The People ha[ve] the burden to prove the charges were timely brought. [Citation.] Generally, the burden to show this is by a preponderance of the evidence. [Citation.]" (*People v. Ruiloba* (2005) 131 Cal.App.4th 674, 681 [31 Cal.Rptr.3d 838] (*Ruiloba*).)

Defendant challenges the application of section 803, subdivision (f) based on the last two of the conditions stated in subdivision (f)(2). He asserts that (1) there was contradictory evidence concerning whether his crimes against Doe in 1988 involved "substantial sexual conduct" and (2) there was no independent evidence that clearly and convincingly corroborated Doe's allegations. Neither assertion persuades us that extension of the limitations period was improper.

### 1. *Contradictory Evidence*

Defendant argues that the evidence concerning whether his molestation of Doe when she was eight years old involved substantial sexual conduct was contradictory. While it is true that there was some contradictory evidence concerning the extent of defendant's molestation of Doe when she was eight years old, there was substantial evidence that the molestation involved substantial sexual conduct.

■ "Substantial sexual conduct," for the purpose of applying section 803, subdivision (f), includes digital penetration of the vagina. It does not include touching of the stomach, chest, neck, and back.[4] (§ 1203.066, subd. (b).)

Doe's testimony concerning whether defendant's acts against her when she was eight years old included digital penetration was internally contradictory. She first testified on direct examination by the prosecutor that, when she was eight, defendant's acts were limited to touching her stomach, chest, neck, and back, both over and under her clothing. She stated that defendant did not touch her vagina during this time period. After a break in the proceedings, however, she testified, still on direct examination, that defendant first digitally penetrated her vagina when she was eight years old. Again on cross-examination, Doe testified that defendant digitally penetrated her vagina when she was eight years old.

While Doe's testimony was internally inconsistent, it constituted substantial evidence that defendant's molestation of Doe when she was eight years old involved substantial sexual conduct. Defendant does not argue to the contrary. Instead, he simply notes the inconsistencies. But he provides no authority for the proposition that the substantial sexual conduct condition of section 803, subdivision (f) cannot be established by evidence for which there is contradictory evidence. We know of none. Therefore, defendant has not shown error.

### 2. *Clear and Convincing Corroboration*

Defendant also argues that there was no evidence clearly and convincingly corroborating Doe's allegation that defendant molested her when she was eight years old. We disagree.

■ When a defendant argues on appeal that there was no independent evidence clearly and convincingly corroborating the victim's allegation, our

---

[4] " 'Substantial sexual conduct' means penetration of the vagina or rectum of either the victim or the offender by the penis of the other or by any foreign object, oral copulation, or masturbation of either the victim or the offender." (§ 1203.066, subd. (b).)

task is to determine whether there is substantial evidence corroborating the allegations. (*Ruiloba, supra*, 131 Cal.App.4th at p. 681.) "[T]he corroboration does not have to corroborate each allegation in the criminal pleading, only the 'victim's allegation.' (§ 803, subd. [(f)](2)(B).) . . . Further, the corroboration does not have to be sufficient to support a *conviction*. [Citation.]" (*Ruiloba, supra*, at p. 683, original italics.) For example, evidence obtained in a pretext call leading to an inference that there was sexual conduct with the victim can be substantial evidence corroborating the victim's allegation. (*Id.* at pp. 687–688.)

Here, defendant made statements during the pretext call from which an inference could be drawn that defendant engaged in sexual conduct with Doe when she was eight years old. Defendant argues that there was no mention, in the pretext call, of digital penetration when Doe was eight years old. But the corroborating evidence need not corroborate every element. As this court stated in *Ruiloba*, "The fact [the pretext call] corroborates *any* sexual acts corroborates all of [the victim's] allegations, because the call tended to prove his lewd disposition toward her in particular. [Citation.]" (*Ruiloba, supra*, 131 Cal.App.4th at p. 688.) The pretext call corroborated Doe's allegation that defendant molested her when she was eight years old.

In addition to the pretext call, there was other evidence that corroborated Doe's allegations. Defendant possessed nude pictures of Doe. He fondled another girl's breasts and made sexual remarks about her. He tried to get into the bathroom when his fiancée's 16-year-old daughter was taking a shower. He possessed an Internet profile of a 15-year-old girl, on which was written, "moms with daughters lesbian chat room." This evidence of defendant's uncharged sexual conduct has significant probative value in corroborating the victim's allegations. (*Ruiloba, supra*, 131 Cal.App.4th at pp. 682–683.)

Therefore, there was sufficient evidence to corroborate Doe's allegations against defendant, and the record supports extension of the limitations period pursuant to section 803, subdivision (f).

## B. *Effective Assistance of Counsel*

In the alternative, defendant contends that his trial counsel's performance was deficient because he did not request an instruction to the jury concerning the requirements of section 803, subdivision (f) for extending the limitations period. Such an instruction would have required the jury to decide, based on the evidence, whether the limitations period was extended. Specifically, the jury would have decided whether defendant engaged in substantial sexual conduct with Doe when she was eight years old. We need not determine whether the failure to request an instruction was deficient because, even if it was, the failure to request the instruction did not prejudice defendant.

■ "Under both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution, a criminal defendant has a right to the assistance of counsel. (See *Strickland v. Washington* (1984) 466 U.S. 668, 684–685 [80 L.Ed.2d 674, 691–692, 104 S.Ct. 2052]; *People v. Pope* (1979) 23 Cal.3d 412, 422 [152 Cal.Rptr. 732, 590 P.2d 859].) This right 'entitles the defendant not to some bare assistance but rather to *effective* assistance.' (*People v. Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839].) ' "[I]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof." ' (*In re Avena* (1996) 12 Cal.4th 694, 721 [49 Cal.Rptr.2d 413, 909 P.2d 1017].)" (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 466–467 [78 Cal.Rptr.3d 855].) The test for prejudice is whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (*In re Sixto* (1989) 48 Cal.3d 1247, 1257 [259 Cal.Rptr. 491, 774 P.2d 164].)

It is not necessary for the court to examine the performance prong of the test before examining whether the defendant suffered prejudice as a result of counsel's alleged deficiencies. (*Strickland v. Washington, supra,* 466 U.S. at p. 697.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Ibid.*)

Defendant argues that trial counsel could not have had a valid tactical reason for not requesting the instruction, and the Attorney General makes no attempt to argue to the contrary. Therefore, we proceed to the question of prejudice—whether there is a reasonable probability that the result of the proceeding would have been different if trial counsel had requested instructions to the jury on the statute of limitations as to count I.

Defendant's argument that there was prejudice largely echoes his arguments concerning whether there was evidence of substantial sexual conduct when Doe was eight years old and whether there was independent evidence that clearly and convincingly corroborated Doe's allegation that defendant molested her when she was eight years old. As we noted, there was substantial evidence of substantial sexual conduct, based on Doe's testimony that defendant digitally penetrated her vagina when she was eight years old, and there was ample evidence corroborating her allegation of molestation. The real question here is whether there is a reasonable probability the jury, having heard the contradictions in Doe's testimony concerning digital penetration when she was eight years old, would have found there was no digital

penetration at that age. (See § 803, subd. (f)(2)(B) [substantial sexual conduct requirement].) If the jury had found no digital penetration at that age, the court would have been constrained to conclude that the limitations period expired before the case commenced.

We conclude it is not reasonably probable that the jury, had it been instructed concerning section 803, subdivision (f), would have found that defendant did not digitally penetrate Doe's vagina when she was eight years old. Although Doe initially testified that defendant did not digitally penetrate her vagina when she was eight years old, she reversed that testimony, still on direct examination. On cross-examination, she expressly confirmed that digital penetration took place when she was eight years old. Considering the verdicts, the jury found Doe to be a credible witness. Nothing about the instruction defendant now contends should have been requested would have affected the jury's credibility determination. Furthermore, Doe's testimony revealed many years of defendant's molestation, including numerous instances of substantial sexual conduct. Even considering Doe's original testimony that defendant did not digitally penetrate her vagina when she was eight years old, it is unlikely that the jury would have disbelieved her later reversal of that testimony during direct examination and her express confirmation on cross-examination of the digital penetration.

We therefore conclude that it is not reasonably probable that the jury would have concluded that defendant did not digitally penetrate Doe's vagina when she was eight years old. Accordingly, defendant's contention that he was denied effective assistance of counsel is without merit.

## II

### *Jury Instructions*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III

### *Restitution*

Defendant makes several contentions concerning the trial court's restitution order. He contends: (A) the order violated his jury trial rights, (B) the order violated his equal protection rights, (C) the court abused its discretion in setting the amount of restitution, (D) the participation of the victim's counsel in the restitution hearing was improper, and (E) the court erred by not giving

---

[*]See footnote, *ante*, page 415.

defendant credit for restitution already paid. Except for the last contention concerning credit for restitution already paid, we find no merit in defendant's contentions concerning restitution.

■ Article I, section 28, subdivision (b)(13)(A) to (C) of the California Constitution provides victims the right to restitution from criminal defendants. It states: "(A) It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer. [¶] (B) Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss. [¶] (C) All monetary payments, monies, and property collected from any person who has been ordered to make restitution shall be first applied to pay the amounts ordered as restitution to the victim."

Implementing California Constitution, article I, section 28, subdivision (b)(13), Penal Code section 1202.4, subdivision (f) requires the trial court to order the defendant to pay restitution to the victim "in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." "The defendant has the right to a hearing before a judge to dispute the determination of the amount of restitution. . . ." (§ 1202.4, subd. (f)(1).)

■ With one exception, restitution orders are limited to the victim's economic damages. The exception is for "[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288." (§ 1202.4, subd. (f)(3)(F); see *People v. Fulton* (2003) 109 Cal.App.4th 876, 884, fn. 5 [135 Cal.Rptr.2d 466].)

Economic damages are "objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities." (Civ. Code, § 1431.2, subd. (b)(1).) Noneconomic damages are "subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." (Civ. Code, § 1431.2, subd. (b)(2).)

At sentencing in this case, the trial court ordered defendant to pay restitution to the victim in an amount to be determined. Doe, through her own

attorney, filed a memorandum requesting restitution. The memorandum sought $3,265 in economic damages for medical care. It also sought $750,000 in noneconomic damages pursuant to section 1202.4, subdivision (f)(3)(F). Attached to the memorandum were two newspaper stories recounting civil jury verdicts of approximately $8 million and $1.7 million in favor of long-term molestation victims against their molesters.

The trial court held a contested restitution hearing. Defense counsel and Doe's attorney were present for the hearing. A deputy district attorney who did not try the case attended the restitution hearing because the deputy district attorney who tried the case was in trial elsewhere. Citing this court's opinion in *People v. Dehle* (2008) 166 Cal.App.4th 1380 [83 Cal.Rptr.3d 461] (*Dehle*), in which we concluded that the restitution hearing was fatally flawed because the prosecutor did not attend the hearing, defense counsel objected to Doe's attorney putting on the case for restitution. He argued that the prosecutor's nonparticipating presence was the same as absence. The trial court distinguished *Dehle* based on the prosecutor's total absence in that case and overruled the defense's objection.

The defense stipulated to the amount of economic damages ($3,265); therefore, the hearing focused on Doe's request for an award of noneconomic damages.

The evidence presented at the restitution hearing established that defendant not only molested Doe, as established by defendant's convictions, but also isolated her and took advantage of a position of trust from the time she was eight years old until she left the home as an adult. She was still having nightmares and flashbacks concerning the abuse. And she had been in therapy to deal with the problems caused by the abuse. She was having difficulty keeping jobs, and, at age 30 at the time of the hearing, had not finished her education, still attending Folsom Lake College. She twice attempted suicide by overdosing on ibuprofen.

In his argument to the trial court, Doe's attorney recognized that the court was in the "unenviable position of having to put a dollar amount on this psychological harm caused to [Doe]." Nonetheless, Doe's attorney asked the trial court to award $750,000 for the extraordinary harm. Counsel suggested that the court could turn for guidance to the civil jury instruction concerning an award of noneconomic damages. (See CACI No. 3905A.)

Defense counsel objected, based on due process and equal protection grounds, to any award of noneconomic damages. He also argued that there

was "no evidence whatsoever to support a $750,000 judgment for restitution for psychological harm."

The trial court agreed that it was in the "unenviable" position of quantifying Doe's psychological harm in dollars. Searching for a way to proceed, the court noted that defendant's acts against Doe occurred over a 15-year period, from age eight to age 23. The court multiplied that 15 years by $50,000 per year, thus arriving at the $750,000 requested by Doe. The court therefore awarded $750,000 in noneconomic damages.

### A. *Noneconomic Damages—Jury Trial Rights*

Defendant contends that, although economic damages are properly awarded at sentencing without a jury determination of the amount, noneconomic damages cannot be so awarded without violating the defendant's right to a jury trial. He asserts that, because noneconomic damages are determined pursuant to a subjective standard, that determination must be made by a jury. "As noneconomic damages in [section 1202.4,] subdivision (f)(3)(F) are indistinguishable from noneconomic damages in the civil trial context," argues defendant, "there is no rational reason why they should not be subject to the right to a jury trial under Article [I], section 28 of the California Constitution."

We disagree. As a sentencing order, a restitution order for noneconomic damages does not give rise to a jury trial right.

"In determining the propriety and amount of restitution, the preponderance of the evidence standard satisfies due process. [Citation.] The defendant is not entitled to a jury trial [citation] and 'the requisite hearing [need not] approximate the formality of a civil trial.' [Citation.]" (*People v. Narron* (1987) 192 Cal.App.3d 724, 736–737 [237 Cal.Rptr. 693], second bracketed text in original.)

Despite this and other authorities stating that a defendant has no right to have a jury determine restitution, defendant attempts to distinguish between restitution orders for economic damages and such orders for noneconomic damages, the latter being available only for violation of section 288. He claims that, because the determination of the amount of noneconomic damages is subjective, the jury must make that determination. But this claim has no merit because there is no basis for distinguishing jury trial rights, or lack thereof, for restitution orders for economic damages and restitution orders for noneconomic damages. In both cases, the trial court is performing a task that, in a civil case, a jury would perform.

Defendant argues that a restitution order for noneconomic damages is indistinguishable from a civil jury award for noneconomic damages. The same can be said, however, for a restitution order for economic damages and a civil jury award for economic damages. While the restitution order and the civil jury award produce the same result (an enforceable judgment against the defendant (§ 1214, subd. (b))), they are a different means to that end, one based in the civil law, with its protections and requirements, and the other in criminal law, with its own protections and requirements. The restitution hearing, whether for economic or noneconomic damages, is a criminal sentencing hearing, not a civil trial. (§ 1202.4, subd. (f)(1); *Dehle, supra,* 166 Cal.App.4th at p. 1386.)

Therefore, contrary to defendant's argument, there is a rational reason for distinguishing restitution orders, provided for by article I, section 28 of the California Constitution and Penal Code section 1202.4, subdivision (f), from the Constitution's provision of the right to a civil jury trial. That rational reason is that the restitution order is part of criminal sentencing.

B. *Noneconomic Damages—Equal Protection*

■ Defendant also contends that a restitution order for noneconomic damages, applicable only to violations of section 288 and not to other crimes, violates his state and federal equal protection rights. Specifically, he asserts that section 1202.4, subdivision (f)(3)(F) deprives child molesters of a civil jury determination of noneconomic damages liability but does not so deprive other criminals. He claims there is no rational reason for this differential treatment. We conclude the contention is without merit because child molesters are not similarly situated to other criminals.

■ "It is basic that the guarantees of equal protection embodied in the Fourteenth Amendment to the United States Constitution and article I, sections 11 and 21, of the California Constitution, prohibit the state from arbitrarily discriminating among persons subject to its jurisdiction. This principle, of course, does not preclude the state from drawing any distinctions between different groups of individuals, but does require that, at a minimum, classifications which are created bear a rational relationship to a legitimate public purpose. [Citations.] Moreover, 'in cases involving "suspect classifications" or touching on "fundamental interests" . . . the state bears the burden of establishing not only that it has a compelling interest which justifies the law but that distinctions drawn by the law are necessary to further its purpose.' [Citations.]" (*In re King* (1970) 3 Cal.3d 226, 232 [90 Cal.Rptr. 15, 474 P.2d 983], italics omitted.)

Defendant suggests that section 1202.4, subdivision (f)(3)(F) may be subject to strict scrutiny because it limits civil jury trial rights. We disagree. Violators of section 288 have the same civil jury trial rights as anyone else. But this is not a civil jury trial; it is a criminal sentencing. Therefore, strict scrutiny is inapplicable.

We also conclude that the differential treatment is rationally related to a legitimate public purpose. Enacted as part of a broader effort to protect child victims of sexual abuse (Stats. 1995, ch. 313, § 5, p. 1755), the noneconomic loss provision of section 1202.4 does just that—helps to protect child victims of sexual abuse, both by increasing the punishment for offenders and by compensating those victims for psychological harm. Differentiating between child victims and other victims is rational based on the vulnerability of children in general and society's interest in protecting children. Therefore, even though section 1202.4 allows restitution orders for noneconomic damages against child molesters only, it does not violate the equal protection provisions of either the federal or state Constitutions.

## C. *Amount of Noneconomic Damages*

Defendant contends the trial court abused its discretion in setting the amount of noneconomic damages. He makes two arguments to support this contention: (1) the award does not meet the requirements applied to an award of economic damages and (2) the award was based on the victim's suffering during years after the crimes were committed. Neither argument is convincing. The standard for awarding economic damages, which by their nature are more definite, cannot be used to challenge an award of noneconomic damages, and Doe's pain and suffering as a result of the crimes has lasted well beyond her childhood.

We review the amount ordered for restitution using the abuse of discretion standard. (*People v. Giordano* (2007) 42 Cal.4th 644, 663 [68 Cal.Rptr.3d 51, 170 P.3d 623].) One way of establishing an abuse of discretion is by showing a demonstrable error of law. (*People v. Millard* (2009) 175 Cal.App.4th 7, 26 [95 Cal.Rptr.3d 751].)

### 1. *Standard for Fixing Noneconomic Damages*

In arguing that the trial court abused its discretion in fixing the amount of restitution for noneconomic loss, defendant cites cases involving economic loss, such as medical costs. For example, in *People v. Carbajal* (1995) 10 Cal.4th 1114, 1125 [43 Cal.Rptr.2d 681, 899 P.2d 67], the Supreme Court stated: "Restitution orders may not be based merely upon the trial court's subjective belief regarding the appropriate compensation; there must be a

factual and rational basis for the amount ordered and the defendant must be permitted to dispute the amount or manner in which restitution is to be made. [Citations.]" Unlike restitution for economic loss, however, loss for noneconomic loss is subjectively quantified.

We are guided in this matter by the civil jury instruction concerning noneconomic loss: "No fixed standard exists for deciding the amount of these damages. You must use your judgment to decide a reasonable amount based on the evidence and your common sense." (CACI No. 3905A (2009 ed.).) On appeal from a civil judgment awarding attorney fees, the review is deferential to the fact finder's decision: "The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently, as in this case, see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court [citation]. The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506–507 [15 Cal.Rptr. 161, 364 P.2d 337].)

The obvious difference between the review of a civil award of noneconomic damages and a criminal restitution order for noneconomic damages is that the trial court, not a jury, makes the determination in the first instance. Even with that difference in mind, we see no reason to adopt any other standard of review. We therefore affirm a restitution order for noneconomic damages that does not, at first blush, shock the conscience or suggest passion, prejudice or corruption on the part of the trial court.

Admittedly, this standard is not as delimited as the review of a restitution order for economic damages. By their nature, economic damages are quantifiable and thus awards of economic damages are readily reviewed for whether they are "rationally designed to determine the . . . victim's economic loss." (*People v. Giordano, supra,* 42 Cal.4th at pp. 663–664.) Noneconomic damages, however, require more subjective considerations. Thus, the different standard is justified.

Applying the appropriate standard, we conclude that the restitution order for $750,000 in noneconomic damages for years of sexual abuse does not shock the conscience or suggest passion, prejudice or corruption on the part of the trial court. (See *Ortega v. Pajaro Valley Unified School Dist.* (1998) 64

Cal.App.4th 1023, 1059–1061 [75 Cal.Rptr.2d 777] [upholding award of $1.5 million to student molested by teacher].) The trial court did not abuse its discretion.

### 2. *Pain and Suffering Years After Crime*

In determining how to fix an amount of noneconomic damages, the trial court expressed its willingness to base the award on 15 years of abuse by defendant. Multiplying that 15 years by $50,000, the court arrived at the figure requested by Doe—$750,000 for noneconomic damages. Defendant asserts that this was an abuse of discretion because he was convicted of only seven years of abuse, ending when Doe turned 15 years old. We are not concerned by the court's statements in making the award. As would a jury, the court was searching for some way to quantify Doe's pain and suffering. And there is no credible argument, especially on the facts of this case, that Doe's psychological harm ended when she was 15 years old. Accordingly, the court did not abuse its discretion.

### D. *Involvement of Victim's Counsel*

Less than two months after this court's decision in *Dehle, supra,* 166 Cal.App.4th 1380, concerning the required participation of the prosecutor in a restitution hearing, California voters, on November 4, 2008, passed Proposition 9, also known as the Victims' Bill of Rights Act of 2008: Marsy's Law. This initiative added or enhanced several state constitutional rights of victims, including rights relating to restitution. The restitution hearing in this case took place one year after the passage of Marsy's Law.

As noted, defendant objected to the participation of Doe's attorney in the restitution hearing, as well as the deputy district attorney's nonparticipation, citing *Dehle, supra,* 166 Cal.App.4th 1380. The deputy district attorney was not the same one who tried the case and was unfamiliar with the case, except that she had discussed, with the deputy district attorney who tried the case, "in general terms this concept and this issue," apparently referring to restitution and the involvement of Doe's attorney in the hearing. She shared with the court the opinion of the deputy district attorney who tried the case that, at the restitution hearing, the People's interest would be consistent with Doe's interest in restitution. When the court asked the attending deputy district attorney whether it was her desire to have Doe's attorney assist in the presentation at the restitution hearing, she replied affirmatively. After that, the deputy district attorney did not say anything on the record, other than saying she did not have additional evidence to present beyond that which Doe's attorney presented.

On appeal, defendant renews his objection, pursuant to *Dehle,* that the restitution hearing was invalid because it was put on by Doe's attorney and

because, although a deputy district attorney was present, she did not participate. We asked for and obtained from the parties supplemental briefing on the effect of Marsy's Law on this issue. Having reviewed the original and supplemental briefing, we conclude that (1) this case is distinguishable from *Dehle* because the deputy district attorney appeared at the restitution hearing, representing the interests of the People, and (2) Doe had a right, under Marsy's Law, to have her attorney appear at the restitution hearing and present evidence and argument.

### 1. *Participation of the Prosecutor*

In *Dehle*, no prosecutor appeared at the restitution hearing. After the victim's attorney presented evidence concerning economic loss, the trial court ordered more than $600,000 in restitution. (*Dehle, supra*, 166 Cal.App.4th at pp. 1385–1386.) Recognizing that "it has long been the law in California that the trial court may permit private counsel to assist the district attorney in a given prosecution," we nonetheless reversed because "[t]he district attorney's obligation to the People to seek a just and fair result can only be accomplished by his presence at the hearing and his consideration of the evidence and issues presented as they bear on the ultimate goals of victim restitution in a criminal case." (*Id.* at p. 1389.)

This case is unlike *Dehle* because here, a deputy district attorney represented the interests of the People at the restitution hearing. She expressed her desire to have Doe's attorney proffer evidence and stated that the People had no further evidence beyond the evidence presented by Doe's attorney.

 Defendant argues that, despite the deputy district attorney's presence at the restitution hearing, this case cannot be distinguished from *Dehle* because the deputy district attorney's participation was insufficient. Specifically, the deputy district attorney was unfamiliar with the case, and she did not present evidence or argument. We disagree. We presume from the presence of the deputy district attorney at the restitution hearing that, if the presentation by Doe's attorney had differed from the People's interests, she would have made that known. (Evid. Code, § 664 [presumption that official duty performed].) The deputy district attorney's unfamiliarity with the case does not rebut this presumption. She was briefed by the other deputy district attorney on the "concept" of the restitution hearing, and she heard the evidence and argument presented by Doe's attorney and defendant. Therefore, she was capable of protecting the People's interests.

### 2. *Victim's Rights under Marsy's Law*

While we conclude that this case is distinguishable from *Dehle*, we also find that the victim restitution provisions of Marsy's Law gave Doe the right to have her attorney participate in the restitution hearing.

 Marsy's Law added several provisions relating to victim restitution to the California Constitution. The victim has the right (1) to be notified of and to be present at all public proceedings, (2) to be heard at any proceeding, including the sentencing hearing, and (3) to receive restitution. (Cal. Const., art. I, § 28, subd. (b)(7), (8) & (13).) The victim has the right to "seek and secure restitution . . . ." (Cal. Const., art. I, § 28, subd. (b)(13)(A).) And "[a] victim, the retained attorney of a victim, a lawful representative of the victim, or the prosecuting attorney upon request of the victim, may enforce the rights enumerated in subdivision (b) in any trial or appellate court with jurisdiction over the case as a matter of right. The court shall act promptly on such a request." (Cal. Const., art. I, § 28, subd. (c)(1).)

As a result of these provisions, Doe had a right to not only be notified of the restitution and to be present, but also to be heard. She was also entitled to have counsel represent her in being heard. Therefore, neither defendant nor the trial court could have lawfully prevented the participation of Doe's attorney in the restitution hearing.

 Despite these clear provisions, defendant contends that they cannot be read "to allow the victim's civil attorney the right to conduct restitution hearings in the prosecutor's place . . . ." We need not reach the question as characterized by defendant because, although Doe's attorney presented the evidence and was allowed to argue at defendant's restitution hearing, the prosecutor was also present, representing the People's interests. The appropriate characterization of the question is whether Doe had the right to have her attorney appear at the restitution hearing and to be heard on the issue of restitution. The answer to that question is unequivocally yes. Marsy's Law not only gives the victim the right to restitution but also to be heard through counsel at the restitution hearing.

Defendant also argues that, if the victim has the right to conduct restitution hearings, Marsy's Law must also be interpreted to give the right to the victim to substitute herself for the prosecutor in enforcing all of the other rights in subdivision (b) of section 28 of article I of the California Constitution. For example, it would give the victim the right to conduct bail hearings and discovery proceedings. Again, defendant overstates the involvement of Doe's attorney in the restitution hearing. Doe did not substitute herself for the prosecutor. Her attorney presented evidence and argued on behalf of Doe only, and the deputy district attorney was present to protect the People's interests. It is unremarkable that the People's interests did not diverge from Doe's interests at the restitution hearing.

Accordingly, Doe was entitled to have her attorney present evidence and argument at the restitution hearing, and that involvement did not invade the exclusive province of the district attorney's prosecutorial authority.

### E. *Credit for Restitution Paid*

Before the restitution hearing, $79,210.68 in funds had been lodged with the court on behalf of defendant. At the restitution hearing, the court ordered those funds to be released to Doe. The court, however, did not give defendant credit for those funds when it issued the abstract of judgment and writ of execution.

Defendant contends, and the Attorney General agrees, that the trial court should have reduced the amount due to Doe in the abstract of judgment and writ of execution by the amount ($79,210.68, plus interest accrued) released to Doe at the restitution hearing. We agree. The court should have noted the partial satisfaction of the restitution amount in the order and the writ of execution. (See Code Civ. Proc., § 699.520, subd. (e) [writ of execution to reflect reduction for partial satisfaction]; Code Civ. Proc., § 674, subd. (a)(5) [abstract of judgment to reflect amount ordered].) Because we do not know how much interest accrued on those funds, we must remand for the trial court to make those corrections.

## IV

### *Other Sentencing Issues*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is modified as follows: (1) the $200 sex offender fine pursuant to section 290.3 is reduced to $100; (2) the $5,600 parole revocation fine pursuant to section 1202.45 is stricken; (3) defendant's presentence custody credit is modified to 60 days; (4) a $40 court security fund fee pursuant to former section 1465.8, subdivision (a)(1) is imposed; and (5) a $60 court facilities funding assessment pursuant to Government Code section 70373, subdivision (a)(1) is imposed. As modified, the judgment is affirmed. The case is remanded to the trial court to correct the writ of execution to reflect defendant's partial satisfaction of the restitution order. The court must

---

[*]See footnote, *ante*, page 415.

also prepare an amended abstract of judgment reflecting the modifications to the judgment and the partial satisfaction of the restitution order and send the amended abstract to the Department of Corrections and Rehabilitation.

Blease, Acting P. J., and Hull, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 30, 2011, S196692. Kennard, J., was of the opinion that the petition should be granted.