Filed 10/18/24  P. v. Saucedo CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER SANTOS SAUCEDO, SR.,<br><br>     Defendant and Appellant. | 2d Crim. No. B331005<br>(Super. Ct. No. 21F-03798)<br>(San Luis Obispo County) |

Christopher Santos Saucedo, Sr., appeals from the judgment after he was convicted, by a slow plea, of committing two counts of lewd acts on a child (Pen. Code,[1] § 288, subd. (a)), sentenced to 10 years in state prison, and ordered to pay $50,000 in victim restitution.  Saucedo contends: (1) the judgment should be reversed because the trial court admitted statements obtained

_____

[1] Statutory references are to the Penal Code.

in violation of his *Miranda*[2] rights, and (2) the restitution order must be vacated either because he did not waive his right to be present at the restitution hearing or because the order is not supported by substantial evidence.  We affirm.

## FACTUAL AND PROCEDURAL HISTORY

Mya Doe told an Ohio detective that Saucedo had inserted his fingers and tongue into her vagina.  Detective Dustin Virgil of the Paso Robles Police Department spoke with Saucedo about Doe's allegations.  Saucedo denied that anything inappropriate happened and agreed to participate in a polygraph examination to prove his innocence.  During a prepolygraph interview, Saucedo admitted that he inserted his index finger in Doe's vagina.  He also admitted to touching Doe's breasts and buttocks.

Saucedo moved to suppress the statements he made during the prepolygraph.  The trial court denied the motion, concluding that Saucedo was not in custody; even if he was, his *Miranda* waiver was voluntary.  The parties then agreed to submit the case to the court on the documents by a slow plea.  After considering the documents, the court found Saucedo guilty of committing two counts of lewd acts on a child, and found true various aggravating and mitigating circumstances.  It sentenced him to 10 years in state prison: the upper term of eight years on one conviction, and a consecutive two years (one-third the middle term) on the other.  It also ordered him to pay $50,000 in victim restitution.

## DISCUSSION

*Admission of Saucedo's statements*

Saucedo contends the trial court erred when it admitted the statements he made during the prepolygraph interview because

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

2

they were obtained in violation of his *Miranda* rights.  We disagree.

## 1. Background

Saucedo has been diagnosed with intellectual disability disorder, autism, ADHD, anxiety, and temporal lobe epilepsy. After his arrest, Saucedo's attorney declared a doubt as to his competency.  The trial court found Saucedo incompetent to stand trial and suspended criminal proceedings.  Proceedings were reinstated nine months later.

Proceedings resumed with a hearing on Saucedo's motion to suppress the statements he made during the prepolygraph.  At the beginning of the suppression hearing the trial court took judicial notice of the existence of the records showing that Saucedo had previously been found incompetent.  The court also took notice of Saucedo's developmental disabilities.

At the hearing Virgil testified that Saucedo volunteered to participate in a polygraph.  Virgil made no threats or promises to Saucedo about his participation.  He told Saucedo that the polygraph would be conducted at the police station.

When Saucedo arrived at the police station, Virgil took him to a small interview room where he met with Christopher Fitzpatrick, a digital forensic specialist from the San Luis Obispo County Sheriff's Office.  Fitzpatrick wore civilian clothes, and Saucedo was not handcuffed.  Virgil left the room and listened from outside.  The door to the room was unlocked.

Saucedo told Fitzpatrick that he had not done a polygraph before.  He said that he gets nervous, has anxiety, and has panic attacks.  He said that he did not want to take the polygraph initially but his mother convinced him that police may see not doing so as a sign of guilt.  Saucedo did not "want to look guilty at

3

all." He believed that if the polygraph went well he could reunite with his wife and son.

Fitzpatrick told Saucedo that he had to leave the room to talk "to the guys" about the case and write down questions they wanted him to ask. He said, "This is kind of secure so just stay in your seat. I don't . . . want you to wander around." Saucedo asked if he could keep the door open. Fitzpatrick replied that it should stay shut "for privacy."

Fitzpatrick explained that Saucedo was not required to answer any questions or give any information. Any information he did provide "could be used against [him] or made available to the party requesting the examination." He then read Saucedo his *Miranda* rights:

> "[Fitzpatrick]: So the next part is just to protect both of us[.] I have to read you your right to remain silent. Okay anything you s—say may be used against you in court. You have a right to the presence of an attorney before or during questioning. If you cannot afford an attorney, one will be appointed to represent you free of charge . . .
>
> "[Saucedo]: I can't afford an attorney.
>
> "[Fitzpatrick]: . . . before any questioning if you wish. Okay? Do you understand?
>
> "[Saucedo]: Yeah.
>
> "[Fitzpatrick]: Okay.

4

> "[Saucedo]:         I can't afford one.
>
> "[Fitzpatrick]:     And—and the other thing is are you willing to give up those rights? Are you willing to answer my questions at this time? Are you okay with talking to me and doin' this?
>
> "[Saucedo]:         Yeah."

Fitzpatrick asked Saucedo if anyone had pressured Saucedo to participate in the polygraph. Saucedo responded, "No, no one forced me to come in." Fitzpatrick then asked Saucedo to sign a waiver of his rights, which Saucedo did.

During the prepolygraph interview Saucedo told Fitzpatrick he was treated four times for mental health issues as a child. He took medications, including a pill for anxiety that morning that was not prescribed to him. He said, "I understand . . . certain things, and then I don't." He needed to have things explained and "dumbed down" for him.

Fitzpatrick said that Saucedo's mental health issues would not prevent him from taking the polygraph. Saucedo asked what would happen if something prevented him from doing so. Fitzpatrick said he would inform Virgil and police would continue their investigation.

Fitzpatrick then proceeded with the interview, and Saucedo admitted to touching Doe's vagina. Later Virgil and his partner joined the interview and asked additional questions. During this portion of the interview Saucedo again admitted to touching Doe's vagina, as well as her breasts and buttocks. He was then arrested.

## 2. *Analysis*

To protect a person's privilege against self-incrimination, before any custodial interrogation law enforcement must advise the person that they have " ' " ' "the right to remain silent, that anything [they say] can be used against [them] in a court of law, that [they have] the right to the presence of an attorney, and that if [they] cannot afford an attorney one will be appointed . . . prior to any questioning . . . ." ' " ' [Citation.]" (*People v. Suarez* (2020) 10 Cal.5th 116, 157 (*Suarez*).) "An interrogation is custodial when 'a person has been taken into custody or otherwise deprived of [their] freedom of action in any significant way.' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400 (*Leonard*).) "Whether a person is in custody is an objective test; the pertinent inquiry is whether there was ' " 'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " ' " (*Ibid.*) This presents "a mixed question of law and fact," requiring us to " 'apply a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and . . . independently decide whether, given those circumstances, 'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave' [citation]." (*Ibid.*)

Circumstances to consider when determining whether a person was in custody during an interrogation include whether they were under arrest, the length of the detention, the location of the detention, " 'the ratio of officers to suspects,' " and " 'the demeanor of the officer, including the nature of the questioning.' " (*People v. Davidson* (2013) 221 Cal.App.4th 966, 972.) Other circumstances to consider include whether police told the person they were "considered a witness or suspect," "whether there were

6

restrictions on the [person's] freedom of movement," whether the police officer's tone was aggressive or accusatory, and whether police otherwise pressured the person. (*Ibid.*)

Based on the totality of the circumstances, we conclude Saucedo was not in custody when he went to the police station for the polygraph. Saucedo went to the police station voluntarily. And even though the polygraph did not occur, "we perceive no material difference between arriving at the station voluntarily to give a statement and doing so to take a polygraph examination." (*People v. Potter* (2021) 66 Cal.App.5th 528, 541.) Saucedo was not handcuffed. When he arrived at the station he was taken to an unlocked interview room. For most of the two-hour interview only one other person—Fitzpatrick—was in the room with him. Fitzpatrick was dressed in civilian clothes and told Saucedo multiple times that he did not have to answer his questions and could end the interview whenever he wanted. Because a reasonable person in Saucedo's position would have felt free to do so, we conclude he was not in custody. (See, e.g., *Leonard, supra*, 40 Cal.4th at pp. 1400-1401 [despite low IQ, development disability, and long duration of interrogation, person not in custody where he was told multiple times that he could he could end questioning at any time and leave]; *People v. Ochoa* (1998) 19 Cal.4th 353, 402-403 [person not in custody where he voluntarily went to police station for polygraph and was told he did not have to answer any questions]; *Potter*, at pp. 541-542 [person not in custody where he voluntarily went to police station, was told he did not have to talk to police and could end interview at any time, and was not restrained, and interview lasted under two hours].)

And even if Saucedo were in custody, we conclude that he validly waived his *Miranda* rights. A *Miranda* " ' "waiver must

7

be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception' [citation], and knowing in the sense that it was 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " ' [Citation.]" (*Suarez*, *supra*, 10 Cal.5th at p. 157.) Factors to consider in evaluating whether the waiver was knowing and intelligent include the suspect's mental capacity, whether they signed a written waiver, whether their rights were explained individually and in their native language, whether they appeared to understand their rights, and whether they had prior experience with the criminal justice system. (*Id.* at p. 160.) Factors to consider in evaluating whether the waiver was voluntary include the length of the interrogation, its location, the suspect's mental and physical health, and any police coercion. (*Id.* at p. 157.) " 'The determinative question " 'is whether [the] choice to confess was not "essentially free" because [the suspect's] will was overborne.' " ' [Citation.]" (*Id.* at pp. 157-158.)

Based on our independent review, we conclude that Saucedo's *Miranda* waiver was knowing and intelligent. (See *Suarez*, *supra*, 10 Cal.5th at p. 158 [appellate court independently reviews whether waiver was knowing and intelligent].) Fitzpatrick explained each of Saucedo's *Miranda* rights individually. There is nothing in the record indicating that Saucedo needed those rights explained to him in any language other than English. Saucedo said that he understood his rights and that he was willing to waive them and take a polygraph. He also said that "no one forced [him] to come in" before he signed a written waiver reiterating as much. (See, e.g., *People v. Jenkins* (2004) 122 Cal.App.4th 1160, 1172-1173 [knowing and intelligent

8

*Miranda* waiver where defendant with cognitive disabilities appeared to understand rights waived].)

We also independently conclude that Saucedo's waiver was voluntary. (See *Leonard*, *supra*, 40 Cal.4th at pp. 1402-1403 [appellate court independently reviews whether waiver was voluntary].) Saucedo volunteered to take a polygraph. Virgil did not threaten Saucedo or make any promises to him. Saucedo knew a polygraph would be conducted at the police station and went there of his own volition. He said that he wanted to answer Fitzpatrick's questions so he did not "look guilty" and could reunite with his wife and son. Such a desire evidences that Saucedo's choice to confess was essentially free and not the result of police coercion. (*Id.* at p. 1403 [despite defendant's limited intelligence, developmental disabilities, and lack of experience with law enforcement, and fact that interrogation took place in small room, *Miranda* waiver voluntary where defendant was not required to answer questions and was free to leave].) The trial court properly admitted Saucedo's statements to Fitzpatrick and Virgil.

### The restitution order

Saucedo contends the restitution order must be vacated because either (1) he did not "validly" waive his right to be present at the restitution hearing, or (2) it is not supported by substantial evidence and lacks a rational basis. We again disagree.

### 1. Background

After convicting Saucedo, the trial court told him that he would have "to pay restitution, subject to a restitution hearing if you disagree with the amount." The court told Saucedo he had "the right to be at that hearing."

9

At sentencing, counsel objected to restitution because there was "no indication that the victim . . . accrued any noneconomic damages." The trial court replied, "We're going to have probation continue to monitor restitution" and set a date for a hearing to determine the status of restitution. The court asked whether Saucedo would waive his appearance for that hearing. Counsel replied, "Absolutely, he's waiving his presence."

Prior to the status hearing the probation department recommended awarding $50,000 in restitution based on the impact Saucedo's crimes "have had []on [Doe] and will continue to have throughout her lifetime." When the trial court asked about the recommendation, counsel acknowledged that the court had "virtually boundless discretion . . . in these types of cases" under *People v. Smith* (2011) 198 Cal.App.4th 415 (*Smith*). "If the [c]ourt feels that, in its estimation, the [$]50,000 is reasonable then so be it and [Saucedo] will therefore waive the hearing and accept that figure." The court said that it wanted to go over the probation report and other evidence before deciding how much restitution to order. It noted that counsel believed the restitution amount was high but was "not going to object to it."

At the restitution hearing counsel again reiterated that Saucedo did not object to $50,000 in restitution: "I think there is a basis, if the court feels comfortable in concluding that $50,000 is reasonable, even though it's non-economic. . . . If the court feels there is sufficient factual basis to justify exercising its discretion to award a $50,000 restitution, we are okay with that." The court then ordered Saucedo to pay $50,000 in restitution for Doe's noneconomic damages.

10

## 2. *Analysis*

### a. *Saucedo's presence at the restitution hearing*

A defendant has the right to be physically present when a felony sentence is imposed. (§ 977, subd. (b)(1).) This includes the right to be present when a trial court orders victim restitution. (*People v. Nieves* (2021) 11 Cal.5th 404, 508.) The defendant may waive the right to be present at a restitution hearing by entering a knowing, voluntary, and intelligent waiver. (*Ibid.*) Counsel may enter such a waiver on a defendant's behalf so long as there is "some evidence that the defendant understood the right [they were] waiving and the consequences of doing so." (*People v. Davis* (2005) 36 Cal.4th 510, 532 (*Davis*).) We independently determine whether counsel entered a valid waiver here. (*People v. Gutierrez* (2003) 29 Cal.4th 1196, 1202.)

We conclude there was. After convicting Saucedo, the trial court told him that he would have to pay restitution and that he had the right to be present at the restitution hearing. During sentencing—when Saucedo was present—the parties discussed probation's restitution recommendation. Counsel then waived Saucedo's presence at the restitution status hearing, with no objection by Saucedo. At that hearing counsel represented that Saucedo would accept the $50,000 figure and waive a formal restitution hearing. That representation, considered alongside the trial court telling Saucedo he had the right to be present at any restitution hearing and the lack of objection from Saucedo when counsel waived his presence for the status hearing, constitutes "some evidence" that Saucedo knew the rights and consequences he was waiving.

But even if it did not, we conclude Saucedo's absence from the restitution hearing was harmless beyond a reasonable doubt.

11

(See *Davis*, *supra*, 36 Cal.4th at p. 532.)  The trial court told Saucedo that restitution was going to be imposed.  The court also told him the amount of restitution under consideration.  Months later, counsel said he understood the scope of the court's discretion when imposing restitution and that Saucedo would accept the recommended amount.  Thus, counsel had the opportunity to bring Saucedo's concerns, if any, to the court's attention but did not.  We are convinced beyond a reasonable doubt that the result would not have been different had Saucedo been present at this hearing.  (See *id.* at pp. 533-534.)

> b. *Evidence supporting the restitution order*

The California Constitution provides victims the right to restitution for losses caused by criminal defendants.  (*Smith*, *supra*, 198 Cal.App.4th at p. 431; see Cal. Const., art. I, § 28, subd. (b)(13).)  Pursuant to section 1202.4, subdivision (f), trial courts must order restitution "based on the amount of loss claimed by the victim or victims or any other showing to the court."  Restitution is generally limited to economic damages (*Smith*, at p. 431), but may also be ordered for noneconomic damages stemming from a defendant's violations of section 288 (§ 1202.4, subd. (f)(3)(F)).  "Noneconomic damages are 'subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation.' "  (*Smith*, at p. 431.)

We review a restitution order that includes noneconomic damages for abuse of discretion.  (*Smith*, *supra*, 198 Cal.App.4th at p. 435.)  " ' " 'Where there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found.' " ' "  (*People v. Millard* (2009) 175

12

Cal.App.4th 7, 26.) We will affirm a restitution order so long as it "does not, at first blush, shock the conscience or suggest passion, prejudice[,] or corruption on the part of the trial court." (*Smith*, at p. 436.)

There was no abuse of discretion here. During the proceedings below Saucedo agreed to waive any challenge to a $50,000 restitution order, and later said that he was "okay with that" amount. Because Saucedo stipulated to the amount of restitution, any challenge to the calculation of the restitution award is not cognizable on appeal. (*Mt. Holyoke Homes, LP v. California Coastal Com.* (2008) 167 Cal.App.4th 830, 842 [doctrine of invited error estops party that induces commission of error from asserting alleged error is ground for reversal].)

And we would reject Saucedo's challenge even if it were. The trial court said that it relied on the probation report to calculate the restitution award. The report based the $50,000 figure on the psychological harm Doe had endured and would continue to endure as a result of Saucedo's abuse. Our sister courts have upheld restitution orders with even greater baselines for calculating noneconomic damages for psychological harm. (See, e.g., *People v. Lehman* (2016) 247 Cal.App.4th 795, 803-804 [$100,000 per year of abuse for "immeasurable psychological harm"]; *Smith, supra,* 198 Cal.App.4th at pp. 436-437 [$750,000 for seven years of abuse and years of psychological trauma that followed].) The trial court's use of a lower baseline here therefore does not shock the conscience or suggest passion, prejudice, or corruption.

Saucedo also failed to challenge this baseline during the proceedings below. He cannot do so now. We accordingly

13

conclude there was a rational basis for the restitution award, and no abuse of discretion.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


BALTODANO, J.


We concur:


GILBERT, P. J.


CODY, J.

Barry T. LaBarbera, Judge

Superior Court County of San Luis Obispo

_____

Mi Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.