Filed 8/27/15  P. v. Murphey CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DAVID ALLEN MURPHEY,<br><br>    Defendant and Appellant. | F068994<br><br>(Stanislaus Super. Ct. No. 1402538)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Thomas Zeff, Judge.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Appellant/defendant David Allen Murphey was convicted of four counts of committing lewd acts upon a child under the age of 14 years (Pen. Code, § 288, subd. (a));[1] with the special allegations that defendant engaged in substantial sexual

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

conduct with a victim under the age of 14 years (§ 1203.066, subd. (a)(8)); one count of attempting to commit lewd acts on a child (§§ 664/288, subd. (a)); and one count of exhibiting harmful matter with intent to seduce a minor (§ 288.2, subd. (a)). The victim was his stepdaughter, who disclosed the molestations to her mother (defendant's wife) when she was nine years old, and reported that defendant began to molest her when she was five years old. Defendant was sentenced to 15 years eight months in prison, and the court ordered defendant to pay noneconomic restitution of $250,000 to the victim.

On appeal, defendant contends the court abused its discretion when it received the verdicts and polled the jury, and one juror initially failed to affirm the verdicts. Defendant asserts the court should have immediately ordered the jury to resume deliberations instead of continuing to question the juror, and then concluding that the juror affirmed the guilty verdicts. Defendant also contends the court abused its discretion when it ordered him to pay noneconomic restitution of $250,000 to the victim, pursuant to section 1202.4, subdivision (f)(3)(F), which authorizes noneconomic restitution to child molestation victims under certain circumstances.[2] We affirm.

## FACTS

Jennifer M. (Jennifer) is the mother of "Jane Doe" (Jane), born in 1999.[3] When Jane was about two years old, Jennifer began a relationship with defendant, and he lived with them.

In 2003, Jennifer and defendant were married. Jane considered defendant as her stepfather. In 2006, Jennifer and defendant had a son.

---

[2] In his opening brief, defendant raised another issue, and argued the court erroneously calculated his presentence credits. In response, the People set forth the calculations based on defendant's custodial periods. In his reply brief, defendant concedes he made a mathematical error in his opening brief, the court correctly calculated his presentence credits, and he withdrew the argument.

[3] As in the trial proceedings, we will also refer to the victim by the name of Jane Doe.

2.

Starting in 2005, Jennifer attended college and worked. Defendant took care of the children at home.

**Domestic Disputes Between Defendant and Jennifer**

Jennifer testified there were domestic disputes, verbal abuse, and violence in her relationship with defendant. Jennifer and defendant had argued in the past, which led to her threats to leave. Defendant once attempted suicide and threatened that if he could not have the children, then she could not either.

In 2007, Jennifer and defendant separated and they lived apart. After a few months, they reconciled and lived together again with the children.

Officer Ron Lemings testified for the defense about an incident in September 2008, when he responded to defendant's house on a report of suspicious circumstances. Defendant was not there. Lemings spoke to Jennifer, who said she had previously left the house because defendant was drinking heavily. Jennifer said she took the children to her mother's house and then returned to her own house. She discovered defendant was still drinking and other people were there. She also noticed several things were missing or had been broken in their house. Jennifer said defendant had grabbed her sweater sleeve, but he did not harm her. She said defendant screamed at her and slapped the windshield of her car.

Officer Lemings testified that as he spoke with Jennifer in the house, someone threw a rock through the window, and it landed at their feet. Jennifer grabbed her child and ran outside. About 10 minutes later, Lemings found defendant walking toward the house. He was intoxicated and admitted he threw the brick. Lemings arrested defendant for being drunk in public; he did not charge him with any other offenses. Lemings conceded that based on Jennifer's statements, defendant could have been charged with vandalism, possession of stolen property, criminal disturbance, assault with a deadly weapon, assault on an officer, and child endangerment.

3.

At trial, Jennifer testified about the September 2008 incident and explained how defendant threw a cinder-block brick through the window while she was talking to the officer. She testified defendant was arrested, and she thought he had been charged with 14 offenses, including domestic violence, being drunk in public, and endangering an officer. She also believed that all the charges were eventually dropped, and defendant told her that "he could do anything and he would always get away with it."

Jennifer testified that she stopped having intimate relations with defendant because of their fighting. After the domestic violence incident, there were four or five times when she was asleep and defendant "forced himself on top of me." She tried to push him off and said no, but it did not work, and "I was forced to have sex with him that night." The most recent incident was a few weeks before Jennifer contacted the police in this case.

In 2008, Jennifer was scared of defendant and felt she and the children were in danger. She did not know how to leave him and started seeing a counselor at a women's center for help.

**Jennifer Discovers the Websites**

In 2009, defendant, Jennifer, and the two children were living on East Coolidge in Modesto. Jane was nine years old. They had a desktop computer, which was in the master bedroom.

In January or February 2009, Jane told her mother that her vagina was sore or itchy, and there was some blood. Jennifer took Jane to the doctor, and he prescribed an ointment for the irritation.

In May 2009, Jennifer was working on the desktop computer and tried to retrieve a document. As she checked the computer's memory, she discovered that someone had deleted "a multitude" of pornographic websites from the browsing history. She was able to access the computer's history, which revealed several websites had been searched about sexual acts between fathers and daughters, rape, incest, and foot fetishes. She was shocked to find that these websites had been accessed on her computer.

4.

After finding these websites, Jennifer spoke to Jane when they were alone in the house. She asked Jane if defendant had touched or done anything to her. Jane "just looked at me dumbfounded and said no."

**Jennifer and the Children Leave**

Jennifer testified she was already afraid of defendant "because of how he was with me." After she found the pornographic and incest websites, Jennifer was afraid "he was going to move" to Jane. Jennifer contacted her counselor and asked for advice about how to leave defendant. The counselor told her to pack her things and get ready to leave when she had the chance, and the counselor would place her in a safe center.

On the evening of May 12, 2009, Jennifer returned from school, and defendant left to work on his father's car. As soon as he was gone, Jennifer told the children to pack their belongings because they were going to leave. Jennifer took the desktop computer.

Jennifer testified that she loaded the children and their belongings into the car. As they were about to leave the house, she again asked Jane if defendant "had ever done anything to her, and told her that I know how scary he can be and sometimes people will say stuff to scare you, but you don't have to be scared, they can't hurt you. I'm here to protect you. There are people here to protect you. If he did anything, you can tell me because it is okay. That's when [Jane] had admitted that he had been doing stuff to her." Jennifer testified that Jane said defendant would touch her and motioned toward her breast and pelvic areas. Jane was crying and scared.

Jennifer drove to a storage facility where she placed the computer and their other belongings. She called her mother and told her about Jane's disclosures. During the telephone conversation, her mother told her to ask Jane what else had happened. Jennifer turned to Jane and asked if defendant touched her with any of his body parts. Jane said he used his mouth, hands, and penis. Jennifer immediately called the police and reported Jane's disclosures.

5.

## First Interview with the Police

Later on the night of May 12, 2009, Officer Thomason responded to the dispatch, met Jennifer and the children, and escorted them to the police department. Jennifer told Thomason about discovering the pornographic websites on the computer, and Jane's disclosure that defendant molested her. Jennifer told Thomason that defendant was very demeaning and controlling of Jane and herself. Thomason asked her to bring the computer to the police department and she agreed.

Officer Thomason conducted a tape-recorded interview with Jane, who said she was nine years old, and that defendant had abused her for the past four to five years. Jane said defendant forced her to perform sex acts and told her "in a mean way" not to tell anyone, or he would hurt her. Jane said he started when she was five or six years old, but she was not sure because she was so young. Jane thought it had happened around 40 or 50 times. Jane said defendant forced her to lick his private areas, and he inserted two fingers into her front and back private areas. Jane also said she masturbated his private area with her hands and feet, and white stuff came out of his penis. Jane said defendant had penetrated her vagina "a little bit" with his penis. She found blood in her vagina and told her mother. Defendant told Jane to say that she had scratched herself there.

Jane said she asked defendant to stop because she wanted to be "regular" like her friends. Defendant was already strict with her in the house, and he threatened to be even harsher with house rules if she refused. Jane said defendant reassured her that all girls were doing what she was doing, and showed her images on the desktop computer of a father and daughter "doing it." He also showed her pornographic cartoons. Jane thought it was wrong and disgusting, and defendant said it was not disgusting.

The police initially advised Jennifer that defendant was going to be arrested that night. However, they later decided to delay the arrest in order to gather more evidence. Jennifer and the children stayed with a friend.

6.

**Jane's Forensic Interview**

On May 13, 2009, a videotaped forensic interview was conducted with Jane as part of the criminal investigation. Jane identified body parts from a diagram and gave detailed descriptions of how defendant forced her to perform acts of oral copulation on him; defendant performed acts of oral copulation on her; he placed his fingers in her vagina and anus; and he sexually penetrated her vagina. When she told defendant that some of the acts hurt her, he said it would only hurt for a little bit. When he digitally penetrated her, he told her to put a pillow over her head so she could scream since it would really hurt. She was bleeding after he did that act. She told her mother about the bleeding, and defendant told her to just say it was itching.

Jane said that when she was younger, she thought every girl did things like that. When she was older, she told defendant that she wanted to be "regular" and not do it anymore. Jane described specific websites defendant showed her on the computer, which depicted fathers and daughters having sex. He also showed her sexually graphic depictions of "Kim Possible" and other cartoon characters. Jane said defendant took her into the bedroom and performed the sexual acts after Jennifer left for work or school.

Jane said defendant yelled and hit her and her brother whenever they did something wrong. He also "forced" her mother "to do things that she doesn't want to do." Defendant spanked her brother if he did something wrong and tried to stop Jane from comforting him.

The interviewer asked Jane why she decided to finally tell her mother about the molestations. Jane said that when her mother said they were leaving defendant, Jane felt she could tell her mother because they were not going back to defendant's house.

**Forensic Examination of the Computer**

Jennifer delivered the desktop computer to Detective Rodenburg and signed a search waiver. An officer conducted a forensic examination of the desktop computer and the hard drive. He confirmed the reports from Jennifer and Jane that the computer had

7.

been used to access specific sexually explicit pornographic websites, videos which depicted incest, and pornographic cartoons of "Kim Possible" and other characters.

**Jennifer Calls Defendant**

Also on May 13, 2009, Detective Rodenburg asked Jennifer to call defendant so he could record the conversation. He told her to keep things calm and not to make him angry.

Jennifer called defendant twice, and both calls were recorded. During the first call, defendant was concerned and confused about why Jennifer and the children left the house. Jennifer said they were staying with a friend. She told defendant she found something on the computer that upset her and asked about the pornographic and incest websites. Jennifer told defendant she asked Jane if anything happened, and "you should have seen the look that came over her face. She is terrified. She actually started crying." Defendant said he was frightened when he got home and discovered everyone had left, and he wanted to talk to her. Jennifer asked defendant if he showed Jane the pornographic sites on the computer. Defendant said he was afraid of being recorded and wanted to talk to her in person.

During the second call, Jennifer told defendant she was confused and needed to know what happened with Jane. Defendant said he did not want to talk on the telephone. She again asked if anything happened with Jane because "[t]he look on her face tells me it did." Defendant replied, "And so what if I say yes? And you're like going to keep the kids and I'm never going to see them?" Jennifer said no, but again said she just needed to know so they could work on it together. She told defendant that Jane had been bleeding. Defendant said, "I didn't do anything like that." Defendant said, "I didn't tell you I didn't do anything."

Defendant said, "I haven't done anything for freaking ever." Jennifer asked defendant about what he meant. Defendant said, "I told you yes." Defendant added, "[I]f you want to work it out, I'll do whatever you want, and I promise to whatever. And like I

8.

said, I haven't done anything in like a long ass time." Jennifer asked if it was touching. Defendant said yes. Jennifer said that wasn't that bad. Defendant refused to say anything else on the telephone.

**Jane's Trial Testimony**

Jane was 13 years old at trial. She testified defendant first touched her when she was five years old, but she could not remember what happened. Jane testified she was seven or eight years old when defendant placed his fingers in her vagina.

Jane testified about several incidents which occurred when they lived at the East Coolidge house. The incidents occurred when her mother was not home. In one instance, defendant placed Jane in bed with him, and he licked her vaginal area. There were other incidents when defendant touched her breasts, both under and over her clothes. Jane testified defendant made her perform acts of oral copulation on him, and told her what semen would look and taste like. Jane testified about incidents where defendant put one and then two fingers in her vagina.

Jane described another incident where she was in bed with defendant, and he tried to perform an act of intercourse. Defendant placed a pillow over Jane's head "so I could scream as loud as I want, because he said it would hurt." Defendant tried to perform the act, he partially penetrated her, but "it hurt too bad" and he stopped.[4] He tried the same act a few times but "not very often because it hurt."

Jane testified she was bleeding from her vagina after some of these incidents. Jane told her mother about the bleeding, and her mother took her to the doctor. After she saw the doctor, defendant told Jane "not to worry about it and just don't say anything else."

Jane testified she felt she could not say no to defendant because she was scared, and defendant told her "not to tell anyone about the incidents that happened."

---

[4] During the forensic interview, Jane said defendant told her to place the pillow over her head and scream when he digitally penetrated her. Defense counsel cross-examined Jane about this conflict with her prior statements.

9.

Jane testified that defendant once said he was proud of her. He made this statement after he had either digitally penetrated her or forced her to perform acts of oral copulation. However, Jane felt horrible and was not proud of herself.

Jane testified about an incident when she was in the master bedroom with defendant, and they were sitting by the computer. Jane told defendant that she did not feel normal, and "none of the girls in my class did the same thing to their fathers." Defendant said other people "do the same thing," and told her to look at something on the computer. Jane testified he showed her videos on the Internet where "dads and daughters [were] doing the same thing that we had been doing." Jane testified she closed her eyes because she did not want to watch, but saw videos of fathers performing sexual acts with their daughters. Defendant also showed her sexually explicit videos of "Kim Possible," one of her favorite cartoon characters. Jane testified defendant showed her a video on the computer of a man being orally copulated by a girl. After they watched it, defendant told Jane to do the same thing and match the video.

Jane testified that when her mother initially asked if defendant did anything to her, she said no. Jane was scared and did not want anything to happen to her family. She was afraid because of the "tone of voice [defendant] used when he said not to tell anyone."

Jane testified it was a shock when they suddenly left their house. She was not sad to leave, but she did not know what was going to happen next. Jane testified that she finally told her mother that defendant touched her after they packed up and left their home. Jane was not scared anymore because "we were away, and … she was comforting me, telling me it was fine, I could tell her anything" and that defendant "wouldn't try and come hurt us anymore. We were fine and safe."

## DEFENSE EVIDENCE

The defense theory was that Jennifer coached Jane to claim defendant sexually molested her because Jennifer was involved with another man, and she wanted to end her marriage to defendant. Defense counsel extensively cross-examined Jennifer about her

10.

relationship with defendant, and Jane about inconsistencies in her statements about the molestations.

The defense also attacked the fact that Jane did not receive a sexual assault examination. Detective Rodenburg testified he did not arrange for Jane to receive a sexual assault examination because she said the last molestation incident had occurred one or two months earlier. In his experience, there was a seven-to-10-day window to obtain evidence from such an examination. Jennifer testified she did not take Jane for a sexual assault examination because an officer told her it was not necessary, and she did not want to subject Jane to that. Defense counsel extensively cross-examined the investigating officers, and no one could recall having that conversation with Jennifer.

Dr. Antonio Apellanes, a pediatrician, testified that he treated Jane in April 2008 in response to Jennifer's report of bleeding from Jane's vagina. There was no blood in her urine. He found nothing unusual to indicate she was being molested. There was some redness in her vaginal area and he prescribed a cream. In April 2009, he treated Jane because of headaches, bladder problems, and was wetting the bed. He found no evidence of blood in the urine, and she did not report being molested.

**Defendant's Trial Testimony**

Defendant testified that he and Jennifer watched pornographic videos on the computer together. He never watched pornography with Jane. Shortly before Jennifer left him, she told defendant that she needed to delete nude photographs of herself that were on defendant's cell phone. She also threw away sex toys that they had purchased and used together. Defendant asked Jennifer why she was doing these things. She said that she did not want defendant's family to see the items. Defendant testified her responses did not make sense since his family was always at their house.

Defendant testified about his tape-recorded telephone calls with Jennifer. He was surprised and upset that she and the children had packed their things and left the house without any explanation. When Jennifer called him, he wanted to meet her and try to

11.

save their marriage. He admitted that he made an admission during the second call, but he only said what she wanted to believe so she would meet with him.

On cross-examination, defendant denied watching child pornography. He did not recognize the website images about incest which had been recovered from the computer. He admitted that he watched pornographic animation and cartoons, but testified Jane never watched these videos with him.

Defendant was questioned about his pretrial statements to Detective Rodenburg. During that interview, defendant initially claimed he did not know why he was being questioned or what was going on. Defendant also said he was worried about jail and claimed it would not help him. Defendant said that people who "do these types of crimes need help, mental help." Defendant admitted to Rodenburg that Jane had accidentally seen pornography a couple of times, and she asked questions about her sexuality. He told Jane to talk to her mother. Jane later told defendant she was doing the things she saw on the computer and it felt good. Defendant told Jane that she should not be doing that, but it was natural. He also told Jane masturbation was normal when they had a "father-daughter" talk.

Also on cross-examination, defendant admitted he received a general discharge from the Marine Corps after he attempted suicide in 2003; he was already married to Jennifer at the time. In 2007, he stole from his employer.

## Rebuttal

Detective Rodenburg testified about his pretrial interview with defendant. Rodenburg asked defendant about Jane's allegations and whether he made a mistake. Defendant said he "couldn't go there," and that "jail wasn't a good place for him." Rodenburg encouraged defendant to tell the truth. Defendant said "every time he was honest it didn't go so well for him" and the truth would "get him in trouble." Defendant admitted he looked at animated and other types of pornographic sites on the computer.

12.

Jane walked into the room while he was looking at these sites. Defendant never talked to Jane about the images because it was more appropriate for Jennifer to do so.

Detective Rodenburg testified he falsely told defendant that Jane had been examined and there was evidence he touched her. In response, defendant said "the results of the medical examination must have been caused by her masturbating," and Jane had told him that she masturbated.

**Verdict and Sentence**

Defendant was charged with five counts of committing lewd acts upon a child under the age of 14 years (§ 288, subd. (a)) based on the following incidents: count I, oral copulation of defendant, between March 1 and May 13, 2009; count II, oral copulation of the victim, between January 1, 2007, and May 13, 2009; count III, digital penetration, between January 1, 2007, and May 13, 2009; count IV, sexual penetration, between January 1, 2007, and May 13, 2009; and count V, masturbation of defendant, between January 1, 2007, and May 13, 2009, with special allegations that he engaged in substantial sexual conduct with a victim under the age of 14 years (§ 1203.066, subd. (a)(8)). In count VI, he was charged with exhibiting harmful matter with intent to seduce a minor, between February 1, 2007, and May 13, 2009.

The jury found him guilty of counts I, II, III, V, and VI. He was found not guilty of count IV, but convicted of the lesser included felony offense of attempted lewd act upon a child, based on the act of sexual penetration (§§ 664/288, subd. (a)). The special allegations were found true. He was sentenced to 15 years eight months: the upper term of eight years for count I, plus consecutive sentences (one-third the midterms) of two years for counts II, III, and V; one year for count IV; and eight months for count V.

DISCUSSION

I. **The Court did not Abuse its Discretion when it Polled the Jury**

Defendant contends the court abused its discretion and violated his right to jury trial during the polling of the jury. Defendant asserts that Juror No. 1 failed to affirm the

13.

guilty verdicts while being polled, the court improperly continued to question Juror No. 1, and it should have instead immediately ordered the jury to resume deliberations as required by section 1163, which states:

> "When a verdict is rendered, and before it is recorded, the jury may be polled, at the request of either party, in which case they must be severally asked whether it is their verdict, and if anyone answer in the negative, the jury must be sent out for further deliberation." (§ 1163.)

In order to address this issue, we will review the deliberations and the return of the verdicts, and find the court did not abuse its discretion under the circumstances of this case.

### A.    Jury deliberations

On May 16, 2013, the parties finished their closing arguments, and the jury began deliberations at 3:19 p.m. The jury was excused at 4:28 p.m.

At 8:05 a.m. on May 17, 2013, the jury resumed deliberations.

### B.    The verdicts

At 8:32 a.m. on May 17, 2013, the jury returned to the courtroom with the verdicts, which were signed by the foreperson. The clerk read the verdicts. As noted above, defendant was found guilty of all offenses except count IV, but he was convicted of the lesser included offense as to that charge.

### C.    Polling the jury

After the verdicts were read, defense counsel asked the court to poll the jury as to each count. The clerk asked Juror No. 1 if the verdict which was read as to count I was that juror's verdict. Juror No. 1 responded:

"[JUROR NO. 1]:          Go.

"THE COURT:      We have to ask each one of you …."

The reporter's transcript states that Juror No. 1 was "crying." The court directed the clerk to skip Juror No. 1 and poll the other jurors on all counts. The 11 jurors affirmed their verdicts on all counts.

14.

The court directed the clerk to return to Juror No. 1.

"THE CLERK:      Juror Number 1, are the verdicts as read your verdict as to Count I?

"[JUROR NO. 1]:      Ah, can you change your mind?

"THE COURT:      *All right. We're going to send the jurors back into the jury deliberation room. You are not prepared to affirm that those are your verdicts.*

"[JUROR NO. 1]:      *Okay. Do it again.*

"THE COURT:      No, you need to answer my question.

"[JUROR NO. 1]:      Okay. What?

"THE COURT:      Are you prepared to affirm those verdicts as your own verdict?

"[DEFENSE COUNSEL]:  Your Honor, I would object. The juror said can she change her mind.

"THE COURT:      Yes, and I'm asking her another question to follow up on it …

"[DEFENSE COUNSEL]:  I think they should be allowed to continue deliberation.

"[JUROR NO. 1]:      Yes.

"THE COURT:      … [*D*]*o you want to continue to deliberate the verdicts?*

"[JUROR NO. 1]:      No. *No—the others—*"  (Italics added.)

At this point, the transcript states that Juror No. 1 was crying.

"THE COURT:      That's not the question. Do you wish to continue deliberating on the verdicts?

"[JUROR NO. 1]:      No.

"THE COURT:      All right. Are you prepared to affirm the verdicts are yours?

"[JUROR NO. 1]:      Yes.

15.

"THE COURT:        All right. You are going to need to please answer my clerk's questions. Okay?

"[JUROR NO. 1]:    Okay.

"THE COURT:        Thank you."

The clerk again asked Juror No. 1 if the verdicts as read "are your verdicts as to Count I?" Defense counsel interrupted before Juror No. 1 could answer:

"[DEFENSE COUNSEL]: Your Honor, I believe the jurors should be admonished and reminded that the defendant is entitled to her individual deliberation.

"THE COURT:        [W]e're polling her.

"[DEFENSE COUNSEL]: I understand. [¶] She stated that she doesn't believe that the others are going to give. I believe she needs to be reminded that [defendant] is entitled to her individual deliberation, regardless what the others do.

"THE COURT:        I'll handle this. Do you understand me?

"[DEFENSE COUNSEL]: I'm just stating my position, your Honor." (RT 588-589)

The court turned to Juror No. 1 and the following exchange occurred:

"THE COURT:        All right. You stated. [Juror No. 1], you do not have to decide—

"[JUROR NO. 1]:    I know that.

"THE COURT:        --to vote what the rest of the People voted. If you believe that you want to vote against those verdicts, regardless of what the other 11 people did.

"[JUROR NO. 1]:    I know that.

"THE COURT:        Do you understand that?"

The transcript states Juror No. 1 nodded her head "up and down" and she was again crying.

"THE COURT:        Okay. Are you prepared to – do you want another chance to deliberate and talk to the rest of the jurors?

16.

"[JUROR NO. 1]:     No.

"THE COURT:       All right.  And are you prepared to affirm the verdicts as they were announced by my clerk?

"[JUROR NO. 1]:     Yes.

"THE COURT:       *All right.  And you are clear that you don't have to side with the rest of the jury simply because you think that they are not going to change your mind?*

"[JUROR NO. 1]:     *I know that.*

"THE COURT:       *And you know that; is that correct?*

"[JUROR NO. 1]:     *Yes*."  (Italics added.)

The court directed the clerk to poll Juror No. 1 on the verdicts.  Juror No. 1 affirmed "the verdicts as read [are] your verdicts" for all counts.  Thereafter, the court thanked and excused the jurors.  After the jury left, defense counsel asked the court for the transcript of the entire trial to prepare a motion for new trial.

### D.      Postverdict Statements by Juror No. 1

About two hours after the court received the verdicts and excused the jury, the court reconvened because the prosecutor wanted to make a record about speaking to Juror No. 1.  The prosecutor stated that immediately after the trial was over, she was in the hallway and several jurors greeted her, but they did not discuss the case.

> "Juror Number 1 then approached and said, Can I please tell you?  Can I please tell you?  I'm sorry.  It's just some things came up from the past.  [¶]  And, at that point, I was actually trying to walk away … because I did not want to engage in conversation with her.  [¶]  I said, Ma'am, the defense attorney may have contact with you.  [¶]  At that point, [Juror No. 1] said, What?  [¶]  I just want you on notice that he may have contact with you."

Defense counsel noted that when the clerk initially started to poll the jury, Juror No. 1 was "sobbing" for "two to four minutes at my recollection" before the clerk moved onto polling the other jurors.

There is no indication in the record that defendant requested juror contact information, filed a motion for new trial, or filed any posttrial motions regarding Juror No. 1's statements, which were made during the polling or outside of the courtroom. Defendant did not discuss the matter at the subsequent sentencing hearing.

### E. Section 1163

Every criminal defendant is entitled to a unanimous jury verdict, and the verdict must express the independent judgment of each juror. (Cal. Const., art. I, § 16; *Chipman v. Superior Court* (1982) 131 Cal.App.3d 263, 266 (*Chipman*).) The trial court must determine whether the jury has reached a unanimous verdict before it discharges the panel. (*People v. Wattier* (1996) 51 Cal.App.4th 948, 955.)

To assure that the verdict expresses the unanimous judgment of all jurors, any juror is empowered to declare, up to the last moment, that he or she dissents from the verdict. (*Chipman, supra*, 131 Cal.App.3d at p. 266; *People v. Thornton* (1984) 155 Cal.App.3d 845, 858–859 (*Thornton*).)

Accordingly, section 1163 states that after a written verdict is announced, either party may request a polling of each juror to determine whether the verdict is his or her verdict. If any juror answers "in the negative, the jury must be sent out for further deliberations." (§ 1163.) The polling procedure allows the court to determine whether the written verdict form "represents the 'true verdict,' i.e., the verdict that each and every juror is willing to hold to under the eyes of the world, or whether it is a product of mistake or unduly precipitous judgment." (*Thornton, supra*, 155 Cal.App.3d at p. 859.)

However, "not every expression of uncertainty during polling requires that recordation of the verdict be withheld while the jury is sent back for further deliberations." (*Chipman, supra*, 131 Cal.App.3d at p. 267.) The trial court's decision whether or not to order further deliberations pursuant to section 1163 is reviewed for an abuse of discretion. (*People v. Superior Court (Thomas)* (1967) 67 Cal.2d 929, 933 (*Thomas*); *People v. Wattier, supra,* 51 Cal.App.4th at pp. 955–956.)

For example, in *Thomas*, *supra*, 67 Cal.2d 929, the jury returned with a guilty verdict and the defendant requested to poll the jury. One juror expressed doubt about his decision. The court asked the juror a series of questions, and the juror indicated that he did not believe in the verdict, but he went along "with the majority of the jury." The court declared a mistrial. (*Id*. at pp. 930–932.) The People filed a writ petition and argued the court should have ordered the jury to continue deliberations in response to the juror's statements. *Thomas* held the court did not abuse its discretion when it ordered the mistrial:

> "Where, as here, a juror makes equivocal or conflicting statements as to whether he has assented to the verdict freely and voluntarily, *a direct question of fact within the determination of the trial judge is presented. The trial judge has the opportunity to observe the subtle factors of demeanor and tone of voice which mark the distinction between acquiescence and evasion of individual choice*. The trial judge can determine whether returning the jury for further deliberation is likely to secure a real verdict, or whether the juror has really disagreed so that the verdict is not unanimous and not likely to become so.

> "Here on the polling of the jury [the juror] first announced that he had not voted on the verdict. His later answers seemed to indicate that he did not individually agree with the verdict but finally agreed to go along with the majority. Then he stated that the verdict reflected his individual opinion but subsequently seemed to indicate that this merely represented his prior decision to go along with the majority, not his individual belief based on the evidence. *Under such circumstances it was the function of the trial court to determine the state of mind of [the juror]. The determination of the matter rested largely within the discretion of the trial judge*." (*Id*. at pp. 932–933, italics added.)

In *People v. Burnett* (1962) 204 Cal.App.2d 453 (*Burnett*), the clerk read the jury's guilty verdicts and then polled each juror. When asked whether it was her verdict, a juror replied, " 'How do you do that when you are in doubt? I guess you say "Yes.' " (*Id*. at p. 457.) The court asked the juror what she meant: " '[Y]ou guess you say "Yes"? You mean you don't know whether it is your verdict or not?' " The juror said it was her verdict. The court again asked if it was her verdict, and the juror again said yes. (*Ibid*.)

19.

On appeal, the defendant argued that the jury should have been ordered to resume deliberations because of the juror's equivocation when being polled.

*Burnett* held that when a juror " 'at first answers evasively or in the negative, if he [or she] finally acquiesces in the verdict, it must be sustained.' " (*Burnett*, *supra*, 204 Cal.App.2d at p. 458.) In such a case, a juror's " 'preliminary remark was unimportant' " if the juror directly answers the court's question and stated the verdict was her verdict. (*Ibid*.) "At bar, the trial court having determined, and rightly so, that the particular juror in question had concurred in the general verdict, the purpose of the poll (and of the governing statute) had been fulfilled and there was no need for further deliberations." (*Ibid*.)

*In re Chapman* (1976) 64 Cal.App.3d 806 (*Chapman*) dealt with a situation where the jury's written verdict found the defendant not guilty. The court polled the jury, and several jurors stated it was not their verdict and they did not understand. The court questioned the foreperson, who stated that "it was not unanimous, either way," but he signed the not guilty form because "we didn't find him guilty." The court asked additional questions, and the foreperson said the vote was 10 to 2, it was not unanimous, and the jury was hopelessly deadlocked. The court declared a mistrial. (*Id*. at pp. 810–812.)

*Chapman* denied the defendant's writ petition to enter the not guilty verdict, and held the court was not required to order the jury to continue deliberations. *Chapman* explained "the principle that returning the jury for further deliberations" was a "permissible procedure" and not mandatory. (*Chapman*, *supra*, 64 Cal.App.3d at p. 814.)

> "[W]e observe that section 1163 must be construed in conjunction with … section 1140. The latter section authorizes the trial court to discharge the jury when 'at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree.' To reconcile the two sections into a harmonious whole, it must be concluded that *if at the time the jury is polled a negative or equivocal response is received to the poll the trial judge has the discretion to interrogate the jurors further as to whether they are able to reach an*

20.

*agreement under ... section 1140.* [¶] Based on the foregoing, we believe that the conclusion is inescapable that the trial court properly exercised its discretion to consider the application of … section 1140 under the circumstances of the case before it." (*Id.* at p. 814, italics added.)

In *Chipman*, *supra*, 131 Cal.App.3d 263, the jury returned the written verdict form finding the defendant guilty. While being polled, 11 jurors said yes when asked if it was their true verdict. The 12th juror said no. The court asked the juror if the she voted yes in the jury room. The juror said she did. The court asked if the juror had changed her vote. The juror said yes. The court asked if the juror had changed her mind after coming back into the courtroom. The juror said: " 'No, I didn't change my mind, I wasn't sure in the jury room.' " The court again asked if she voted yes "in the jury room," and the juror said yes. The court accepted the guilty verdict as unanimous, and denied defendant's motion for a mistrial. (*Id.* at pp. 264–266.)

*Chipman* held the court improperly accepted the guilty verdict based on the juror's vote in the jury room. *Chipman* distinguished the situation from *Burnett* since the juror advised the court that she had not been sure and she was changing her vote. "The court failed to establish that the juror's present verdict was anything other than the 'No' with which she had responded to the poll. The court thus did not give effect to the right of a juror to change his verdict at any time up to the time that it is finally recorded." (*Chipman*, *supra*, 131 Cal.App.3d at p. 267.)

In *People v. Carrasco* (2008) 163 Cal.App.4th 978 (*Carrasco*), the written verdict form stated the jury found defendant guilty. While polling the jury, one juror initially gave no response to the court's question as to whether it was the juror's verdict. The court again asked, and the juror paused and said yes. The court excused the other jurors, and asked the juror a lengthy series of questions. The juror said it was not her verdict, she felt compelled to vote guilty because of the other jurors, no one put pressure on her, but she had reasonable doubt when she learned the offense was a felony. Upon further questioning, the juror said she concluded the defendant was guilty beyond a reasonable doubt, but she became equivocal about the vote when she learned the charge was a

21.

felony. The court reminded the juror about the instruction that the jury could not consider punishment or penalty, and again asked if she concluded the defendant was guilty beyond a reasonable doubt of the charged offenses. The juror said yes, and the court recorded the guilty verdict. (*Id.* at pp. 987–989.)

*Carrasco* addressed the defendant's motion to obtain the juror's contact information, and held the trial court properly denied the request. (*Carrasco*, *supra*, 163 Cal.App.4th at p. 911.) In doing so, *Carrasco* also held the court had the discretion under *Thomas*, *supra*, 67 Cal.2d 929 to question the juror instead of ordering further deliberations:

> "Considering the equivocal nature of the juror's statements up to that point, we cannot say that the trial court erred in asking additional questions. Ultimately, whether the jury's announced guilty verdict truly reflected Juror No. 2's individual verdict was *a factual question that the trial judge was required to decide….*

> "The trial court's continued inquiry elicited information about whether other jurors had pressured Juror No. 2 – she said that they had not – and that Juror No. 2 was concerned that the offense was a felony, a factor that was legally irrelevant in light of the jury instruction to ignore penalty and punishment [citation]. The trial judge then reminded the juror of that instruction and asked whether the prosecution had proved the charges beyond a reasonable doubt. Juror No. 2 answered, 'Yes.' Under these circumstances, the trial court properly accepted the juror's last answer. [Citation.]" (*Carrasco*, *supra*, 163 Cal.App.4th at pp. 991–992, italics added.)

## F. Analysis

Defendant contends the court abused its discretion and violated section 1163 because it should have immediately ordered the jury to resume deliberations in reaction to Juror No. 1's initial response when she was polled. Defendant further argues the court lacked discretion to question Juror No. 1 because she never gave any equivocal statements and she wanted to continue deliberations. Defendant asserts that "[s]omething was clearly amiss" with Juror No. 1 because she was crying and asked to change her

22.

mind. Defendant concludes that Juror No. 1 never acquiesced in the guilty verdicts and they must be reversed.

Defendant's argument is based on the premise that the court must immediately order the resumption of deliberations if a juror gives a negative response during polling. As explained above, however, a trial court is not required under section 1163 to order the jury to resume deliberations if a juror makes "equivocal or conflicting statements" (*Thomas*, *supra*, 67 Cal.2d at p. 932), " 'at first answers evasively *or in the negative*' " (*Burnett*, *supra*, 204 Cal.App.2d at p. 458, italics added), or give a "*negative* or equivocal response" (*Chapman*, *supra*, 63 Cal.App.3d at p. 814, italics added) when asked to affirm the verdict during polling. Instead, the court "has the discretion to interrogate the jurors further…" (*Ibid*.) In such a situation, the court is presented with "a direct question of fact" to determine "the state of mind of [the juror]" as to whether deliberations should be resumed or the juror "has really disagreed so that the verdict is not unanimous and not likely to become so." (*Thomas*, *supra*, 67 Cal.2d at pp. 932–933.) The court's determination rests "largely within the discretion of the trial judge." (*Ibid*.; *Carrasco*, *supra*, 163 Cal.App.4th at pp. 991–992.)

In this case, the court did not abuse its discretion in response to Juror No. 1's statements. Indeed, the court's initial reaction was to order the jury to resume deliberations. Juror No. 1 interrupted and asked the court to "[d]o it again," presumably referring to the clerk's question about whether the juror affirmed the verdict. At that point, the court attempted to ask the juror the appropriate questions, as in the cases discussed above, to determine whether the juror disagreed with the verdict or further deliberations were required. When the juror made an equivocal reference to "the others," the court asked additional questions and reminded the juror that she did not have to vote along with the rest of the jurors, and she could vote against the verdicts "regardless of what the other 11 people did." The juror replied that she knew and understood, and declined the court's order to resume deliberations. The court again explained that the

23.

juror did not "have to side with the rest of the jury simply because you think they are not going to change your mind," and she said that she knew that. At that point, the juror affirmed the guilty verdicts.

Defendant complains that the court ignored Juror No. 1's request to resume deliberations and instead engaged in a "heated" and "testy exchange" with defense counsel, after which Juror No. 1 finally affirmed the verdicts. While there was a brief exchange between the court and defense counsel, there is no indication these comments influenced the juror as the court continued to question her. Defendant further argues that Juror No. 1's statements showed she was "clearly uncomfortable with being the lone holdout juror, and did not appear comfortable with the idea of further discussions with her fellow jurors." However, the court twice explained to the juror that she was entitled to her own opinion and did not have to acquiesce to the other 11 jurors. Juror No. 1 replied that she knew and understood the principle, and she was ready to affirm the verdicts.

We find the court did not abuse its discretion when it questioned Juror No. 1. The court repeatedly explained that the juror did not have to acquiesce in the verdicts or to the other jurors. Juror No. 1 replied that she knew and understood; she was given repeated opportunities to explain that she had changed her mind or disagreed with the verdict; and she instead affirmed the verdicts.[5]

## II. **Noneconomic Restitution**

Section 1202.4, subdivision (f)(3)(F) provides for an award of restitution for "[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288." In this case, defendant was convicted of four counts of violating section 288, subdivision (a), and one count for the attempted violation of that

---

[5] We reach this conclusion without relying on the prosecutor's statements to the court about her brief postverdict conversation with Juror No. 1. We note, however, that defendant never moved for disclosure of juror identification information or filed a motion for new trial based on this incident.

24.

statute, based on Jane's testimony that he sexually molested her from the ages of five to nine years old. At the sentencing hearing, the court granted the prosecutor's motion and ordered defendant to pay $250,000 in noneconomic restitution to Jane.

Defendant contends the court abused its discretion when it imposed this order without making any findings or comments.

## A. Restitution Motion

The prosecution filed a motion for the court to issue a restitution order for defendant to reimburse the Victim Compensation and Government Claims Board for $900, based on mental health counseling for Jane; and for direct restitution to Jane and her mother for their total economic losses pursuant to proof.

The prosecution also moved for the court to order defendant to pay noneconomic restitution to Jane of $250,000, based on *People v. Smith* (2011) 198 Cal.App.4th 415 (*Smith*). As we will discuss below, *Smith* held that a court did not abuse its discretion when it ordered the defendant to pay noneconomic restitution of $750,000 to a victim who had been sexually molested and suffered psychological harm from the ages of eight to 23 years, based on the formula of multiplying $50,000 by 15 years.

As related to Jane, the prosecution cited the trial evidence that defendant molested her for approximately five years, until her mother took the children and left the house. Defendant was Jane's stepfather; he took advantage of a position of trust and confidence; he inflicted physical injury and emotional trauma; and she was unable to defend herself. The probation officer had contacted Jane's mother in June 2013, who reported that Jane had attended counseling, but she did not want to go anymore. Jennifer wanted her to return to counseling because she was worried Jane may try to hurt herself, and Jane was not doing well either mentally or emotionally. The prosecution asked the court to use *Smith's* formula and order noneconomic restitution of $250,000, based on multiplying $50,000 by five years.

Defendant did not file written opposition to the restitution motions.

**B. The Sentencing Hearing**

At the sentencing hearing, the court asked the defendant to respond to the restitution motions. Defense counsel said the motion for $250,000 was "way out of line here." Counsel noted that he appeared in a similar case the previous day, where a defendant pleaded to molesting a child "over many periods of years," and the court ordered restitution of $10,000, "equivalent with the amount that was submitted to the board."

The prosecutor explained there were two separate restitution motions. One motion was for $900 for economic losses based on counseling expenses. The second motion was for noneconomic restitution based on section 1202.4 and *Smith*, *supra*, 198 Cal.App.4th 415, and evidence of the victim's severe psychological damage.

> "She has forfeited many big events in her life as a child, facing things that she should have never even known about; having to watch pornographic movies with her step dad and being molested by him. I think such damage should be compensated to her by $250,000. [¶] And that is also to have, perhaps, some type of fund for her to seek advancement in schooling. She was a straight A student and had perfect attendance. She's on the right path in life, even though she had a stepfather that took – completely violated her."

Defense counsel objected because there was "not one shred of evidence that was submitted by a psychologist talking about psychological effect on the victim in this case. [¶] Additionally, I just think there's no basis for coming up with a figure of anything close to $250,000."

Thereafter, the court sentenced defendant to 15 years eight months in prison. The court ordered defendant to pay $900 to the Victim's Compensation Government Claims Board as requested by the prosecution.

> "And for restitution for the victim … as requested by the People, on behalf of the victim, the Court will order the amount of $250,000, which is $50,000 a year for a period of five years."

26.

### C. Noneconomic Restitution

Defendant asserts the court abused its discretion when it ordered him to pay $250,000 in noneconomic restitution to Jane because it failed to make any findings or cite any evidence of Jane's alleged psychological damage in support of its order. To resolve these contentions, we turn to *Smith*, *supra*, 198 Cal.App.4th 415, which extensively addressed the determination of noneconomic restitution to child sexual abuse victims under section 1202.4, subdivision (f)(3)(F).

In California, persons found guilty of a crime are normally responsible for two types of restitution. (*People v. Giordano* (2007) 42 Cal.4th 644, 651 (*Giordano*).) First, absent "compelling and extraordinary reasons," all convicted defendants must pay a restitution fine pursuant to section 1202.4, subdivision (b), based on the statutorily authorized amounts, "set at the discretion of the court and commensurate with the seriousness of the offense." (§ 1202.4, subd. (b)(1).)

"Second, when a defendant is convicted of a crime involving a victim who 'has suffered economic loss as a result of defendant's conduct[,]' the court must require the defendant to pay full restitution directly to the victim or victims of the crime...." (*Giordano, supra,* 42 Cal.4th at pp. 651–652, quoting § 1202.4, subd. (f).)

"With one exception, restitution orders are limited to the victim's economic damages." (*Smith, supra,* 198 Cal.App.4th at p. 431.) "Economic damages are 'objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities.' [Citation.]" (*Ibid*.)

As noted above, the one exception to this rule is stated in section 1202.4, subdivision (f)(3)(F), which provides for the court to order the defendant to pay restitution for "*[n]oneconomic losses*, including, but not limited to, psychological harm, for felony violations of Section 288," which prohibits the commission of lewd or

lascivious acts upon minors.  (*Smith, supra,* 198 Cal.App.4th at p. 431, italics added.)  Smith further defined noneconomic damages as " 'subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation.' [Citation.]"  (*Id.* at pp. 931–932.)

On an appeal from an order of restitution for economic loss, the reviewing court ordinarily looks for a " 'factual and rational basis for the amount of restitution ordered by the trial court.' "  (*People v. Mearns* (2002) 97 Cal.App.4th 493, 499.)  In those situations, the trial court must employ an objectively reasonable and discernable methodology rather than simply basing the award on its subjective beliefs regarding the appropriate amount of compensation.  (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1125.)

In contrast, *Smith* explained this standard was not applicable to review orders for noneconomic restitution because "[u]nlike restitution for economic loss … loss for noneconomic [harm] is subjectively quantified."  (*Smith, supra,* 198 Cal.App.4th at p. 436.)  In light of the fundamental difference between the two types of loss, *Smith* held that a different standard of review must be applied to orders of noneconomic restitution to allow for the subjective considerations of the trial court judge.  (*Ibid.*)  "We are guided in this matter by the civil jury instruction concerning noneconomic loss:  'No fixed standard exists for deciding the amount of these damages.  You must use your judgment to decide a reasonable amount based on the evidence and your common sense.' [Citation.]"  (*Ibid.*)

> "The obvious difference between the review of a civil award of noneconomic damages and a criminal restitution order for noneconomic damages is that the trial court, not a jury, makes the determination in the first instance.  Even with that difference in mind, we see no reason to adopt any other standard of review.  We therefore affirm a restitution order for noneconomic damages that does not, at first blush, shock the conscience or suggest passion, prejudice or corruption on the part of the trial court.

"Admittedly, this standard is not as delimited as the review of a restitution order for economic damages. By their nature, economic damages are quantifiable and thus awards of economic damages are readily reviewed for whether they are 'rationally designed to determine the ... victim's economic loss.' [Citation.] Noneconomic damages, however, require more subjective considerations. Thus, the different standard is justified." (*Id*. at pp. 436–437.)

## D. *Smith's* Calculation of Noneconomic Restitution

*Smith*, *supra*, relied on these standards to affirm a trial court's order for noneconomic restitution in that case. The defendant was convicted of violating section 288 and section 288.5 (continuous sexual abuse), based on repeatedly molesting his stepdaughter from the time she was eight years old to when she was 15 years old. The sexual abuse included almost daily acts of oral copulation, digital penetration, and sexual intercourse. He continued to force her to have sex with him until she was 23 years old, but he was not convicted of committing any offenses after she was an adult. (*Smith, supra,* 198 Cal.App.4th at pp. 419-422, 433.) At the restitution hearing, the victim's attorney filed a motion for noneconomic restitution under section 1202.4, subdivision (f)(3)(F), and requested $750,000. The victim's attorney stated that the defendant "isolated her and took advantage of a position of trust from the time she was eight years old until she left the home as an adult. She was still having nightmares and flashbacks concerning the abuse. And she had been in therapy to deal with the problems caused by the abuse. She was having difficulty keeping jobs, and, at age 30 at the time of the hearing, had not finished her education .… She twice attempted suicide by overdosing on ibuprofen." (*Id*. at p. 432.) The defendant objected and argued there was no independent evidence to support a restitution order for psychological harm. (*Id*. at p. 433.)

The trial court in *Smith* "agreed that it was in the 'unenviable' position of quantifying [the victim's] psychological harm in dollars. Searching for a way to proceed, the court noted that defendant's acts against [the victim] occurred over a 15-year period, from age eight to age 23. The court multiplied that 15 years by $50,000 per year, thus

29.

arriving at the $750,000 requested by [the victim]. The court therefore awarded $750,000 in noneconomic damages." (*Smith*, *supra*, 198 Cal.App.4th at p. 433.)

Smith concluded that based on the subjective standards it had delineated for the calculation of noneconomic restitution, the court's order for $750,000 "for years of sexual abuse does not shock the conscience or suggest passion, prejudice or corruption on the part of the trial court. [Citation.]" (*Smith*, *supra*, 198 Cal.App.4th at pp. 436–437.) The defendant argued the court abused its discretion by using 15 years as the multiplier because he was convicted of "only seven years of abuse." (*Id*. at p. 437.) *Smith* rejected this argument: "We are not concerned by the court's statements in making the award. As would a jury, the court was searching for some way to quantify [the victim's] pain and suffering. And there is no credible argument, especially on the facts of this case, that [the victim's] psychological harm ended when she was 15 years old." (*Id*. at p. 437.)

### E. Analysis

As applied to this case, the court had discretion to order noneconomic restitution under section 1202.4, subdivision (f)(3)(F) given defendant's convictions for four counts of violating section 288, subdivision (a), based on sexually molesting Jane from the age of five to nine years old. In contrast to *Smith*, the court's order was limited to the actual five-year period that defendant molested Jane.

Defendant complains there was no evidence of psychological trauma to support the order. However, this argument ignores the fact that the court presided over defendant's trial and heard Jane Doe's detailed and stark testimony about defendant's sexual molestation of her, which included threats of strict punishment if she disclosed the molestation, assurances that other fathers engaged in similar conduct with their daughters, and forcing her to watch pornography on the Internet and directing her to duplicate the sexual acts. Jane's mother advised the probation officer that Jane was not doing well either mentally or emotionally, and she was worried Jane might try to hurt herself. When the court sentenced defendant, it found Jane was vulnerable, he inflicted

physical and emotional trauma on her, and he took advantage of a position of trust and confidence. The court also found substantial evidence of defendant's planning, sophistication, and premeditation in the commission of the sexual assaults.

Based on *Smith's* analysis and review of noneconomic restitution orders, we cannot say the court abused its discretion when it ordered defendant to pay noneconomic restitution of $250,000 to Jane because the order does not "shock the conscience or suggest passion, prejudice or corruption on the part of the trial court." (*Smith*, *supra*, 198 Cal.App.4th at p. 437.)

## **DISPOSITION**

The judgment is affirmed.

_____

Poochigian, J.

WE CONCUR:

_____

Levy, Acting P. J.

_____

Peña, J.