Filed 3/26/25  P. v. Mitchell CA4/2
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication
or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E076032 |
| v. | (Super.Ct.No. RIF1605412) |
| CAMERON LIONEL ISAIAH MITCHELL, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Charles J. Koosed, Judge.

Convictions affirmed; sentence vacated and remanded for resentencing.

Donna L. Harris and Howard C. Cohen, under appointment by the Court of

Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, Warren J. Williams and Steve

Oetting, Deputy Attorneys General for Plaintiff and Respondent.

1

In 2019, a jury convicted defendant and appellant Cameron Lionel Isaiah Mitchell of nine counts of sexual abuse against three child victims; he was between 18 and 24 years old when he committed these offenses. Because there were multiple victims, the crimes fall under the "One Strike" law; in 2020, the trial court sentenced him to 145 years to life. Defendant appealed and, inter alia,[1] challenged his prison sentence as violating his equal protection rights because, as a One Strike offender, he is excluded from the procedure set out in Penal Code section 3051, which mandates youthful offender parole hearings after at most 25 years in prison for most people who receive de facto life sentences for crimes they commit when they are 25 years old or younger. Initially, we agreed with his challenge and reversed his sentence.

Subsequently, the Supreme Court granted review, limited to the equal protection question, and issued its decision rejecting defendant's challenge. (*People v. Williams* (2024) 17 Cal.5th 99 (*Williams*) [excluding defendants sentenced under One Strike law from § 3051 relief does not violate equal protection].) Defendant's case was remanded to this court, and the Supreme Court directed us "to vacate [our] decision and reconsider the cause in light of [*Williams*]." The People submitted a letter brief asserting this court must reject defendant's equal protection argument and asking the matter be remanded to the trial court for a determination as to whether the sentence is cruel and/or unusual. In his supplemental opening brief, defendant concurs on remanding the matter to the trial court

---

[1] Defendant also claims his sentence constitutes cruel and unusual punishment, the restraining orders are unauthorized, and there are errors in the restitution order which require reversal/vacatur and remand for reconsideration.

2

to determine the cruel and/or unusual punishment issue, but argues for us to reverse the restitution orders awarding his victims with noneconomic damages.

We vacate defendant's sentence and remand for a full resentencing. In all other respects, we affirm the judgment.

## I. PROCEDURAL BACKGROUND AND FACTS

### A. *The Mitchell Family Fosters CL and DA*

CL (born in June 2002) was placed in foster care with foster mother and her sons, defendant and his brother when she was five years old. Defendant was born on May 5, 1992, and is just over 10 years older than CL. Other foster children lived with the family from time to time, including DA, who was born in August 2001 and stayed with the family for about a month and a half when she was nine or 10.

### B. *Defendant's Molestation of CL While He Was a Minor*

Defendant began sexually abusing CL when she was five or six and he was about 16 years old. She recalled one specific incident when her foster mother asked her to call her sons for dinner. Defendant did not respond, and CL went upstairs to get him.[2] When she found him, he exposed his penis and told her to put her mouth on it. He used his hand to push on the back of her head, forcing her to orally copulate him.

This kind of abuse occurred many more times. On one occasion, defendant had CL remove her pants and underwear. He bent her over on her bedroom floor and

_____

[2] The prosecution did not charge acts that defendant committed before he was 18 years old or outside of Riverside County. The evidence of these prior acts was admitted at trial under Evidence Code section 1108.

3

attempted to sodomize her, which injured her and caused her to bleed. CL told her foster mother she was bleeding. Her foster mother asked whether anyone had touched her, but CL said no.

On another occasion, after CL had turned six, defendant again had CL orally copulate him when she came to get him for dinner. He warned if she told anyone, they would not believe her, and she would be sent back into foster care. Another time, while CL was visiting a family friend in Long Beach, defendant came into the room where she was staying and had her stick her hand down his pants and rub his penis.

For almost a year, when she was six and seven, CL lived with an uncle and was no longer subject to the abuse. However, she moved back with the Mitchell family after she turned eight and stayed until she was almost 10. There, she lived with several other foster children, including DA.

### C. Forced Oral Copulation (Count 1)

While CL was eight and defendant was 18, he had her orally copulate him approximately every other week. CL recounted one incident that occurred after she and DA asked defendant if they could have ice cream. Defendant said they could, but only if both girls did "him a favor." Defendant said DA would have to allow him to perform oral sex on her and that CL would have to orally copulate him. On another occasion while CL was still eight, defendant put strawberry lubricant on his penis and told CL to "suck it," which she did thinking he would force her otherwise.

4

*D. Defendant Groped DA (Count 8)*

On the night of the ice cream incident, defendant was tickling DA. He moved his hand lower and squeezed her buttocks for several seconds. DA went to tell her foster mother, but defendant said not to wake her.

*E. Defendant Groped TF During a Sleepover (Count 10)*

CL was friends with TF, who lived in the same apartment complex. TF was a few years older than CL. On one occasion when CL was eight and TF was 11 or 12, CL invited her to a sleepover. The two girls began the night sleeping in the same bed, but defendant came into the room and told TF she should sleep in the other bed in the room. Sometime after TF moved into the second bed, defendant returned and began rubbing her shoulders and chest before sticking his hand in her pants underneath her underwear. As he moved his hand toward her vagina, TF clenched her legs and said, "No." Defendant replied, "Please, please. Just a little bit." TF screamed for CL to turn on the lights. After CL turned on the lights, defendant took his hand out of TF's pants, told the girls to go back to sleep, and left the room. TF was too ashamed to tell anyone about the incident until she was later contacted by a detective in 2016.

*F. Defendant Orally Copulated TF (Count 9)*

A couple of weeks later, TF was sitting with some friends on the stairs outside her apartment. TF went back to her apartment to get some food, closing the door behind her. As she prepared food in the kitchen, she looked up and saw defendant in her hallway. She told him he had to leave, but he said he needed to use the restroom. TF told him he had to hurry up and then leave. Defendant called TF over to the hallway, picked her up

5

and tried to carry her to her mother's bedroom, saying he wanted to "play a game." When she protested, he took her to the living room and sat her on the couch. Defendant got on his knees and took off TF's pants and underwear. Pushing her knees into her shoulders, he performed oral sex on her for about 20 seconds. Eventually, she pushed him away. She ran to the front door and called one of her brother's friends to come inside, then ran to the bathroom to put her clothes on. Defendant jumped off the balcony and left. Once again, TF felt shame and embarrassment and did not report the assault because she did not want anyone to find out about it.

*G. Defendant Raped CL When She was 10 Years Old (Count 3)*

When CL was nine, the family moved to a house in Moreno Valley. CL said it was at that point that defendant began having sexual intercourse with her. However, she was unable to recount a specific incident that occurred while she was nine years old.[3]

CL recalled one instance of rape in the summer when she was 10. Defendant woke her one night by shaking her shoulder. He climbed into her bed and pulled off her pants. CL told him to stop and covered her face, but he continued, removing her pants and pulling down his shorts. CL resisted and attempted to pull her pants up, but defendant pulled them back down. He then got on top of her and forced his penis inside her vagina. The incident lasted about 10 minutes.

---

[3] The jury acquitted Mitchell on count 2, which charged him with unlawful sexual intercourse during this period.

*H. Defendant Raped CL (Counts 4-5) and Groped her Breasts when She was 11 to 12 Years Old (Count 7)*

Defendant continued to have sexual intercourse with CL on a monthly basis while she was 11 and 12.  These incidents were forced, and she never agreed to them.  Although defendant didn't strike her, he would restrain her, and she would struggle with him.  After she turned 12, defendant began groping her breasts prior to engaging in oral or vaginal sex.

*I. Defendant's Uncharged Acts Against CL in San Jose*

CL suffered from anger management issues and had a difficult time dealing with what was happening to her.  Around the time she was 13, she started a fire at school, and the family moved to an apartment in San Jose as a result.  The forced sex continued after they moved.  CL said they had sexual intercourse about four times, and defendant orally copulated her.  On one occasion, while they were still unpacking, defendant took CL's body wash.  When she tried to retrieve it, he pushed her against a wall, restrained her, pulled down her pants, and vaginally raped her.

*J. Defendant Raped CL in Hemet When She Was 13 (Count 6)*

CL moved to Hemet to live with defendant's brother, Curtis, after she turned 13.  Defendant visited on two occasions.  On one occasion, while Curtis was in his room and CL was cleaning the kitchen, defendant grabbed her, put her up on the countertop, and vaginally raped her.  CL told him to stop and tried to get off the counter, but he overpowered her and told her to be quiet.  On the other occasion, a few months later, defendant told CL to undress and then took pictures of her vagina while she lay on a bed.

7

While taking some of the photos, he penetrated CL's vagina with his finger. Afterward, he had intercourse with her.

### K. CL Reveals the Years of Abuse

CL said she did not tell her foster mother about the abuse because she thought her foster mother would not believe her. This changed when the two got into an argument when the foster mother picked up CL after she stayed for a month at her father's place. The foster mother accused CL of having sex with a 20-year-old boy and threatened to take her to the doctor for an examination. The foster mother also threatened to have CL's father sent back to prison for allowing the sex to happen. CL was afraid the examination would show she had sex because of the incidents with defendant, so she told her foster mother about him. Her foster mother said she could slit CL's throat for lying and accusing her son, then she slapped CL in the face. The foster mother left to run an errand but threatened a beating when she returned. CL took some belongings and went to a friend's house. Based on the advice of her father, she contacted the police and disclosed the years of abuse.

### L. Additional Uncharged Acts of Sexual Abuse

In 2008, SL was a junior in high school and attended the same high school as defendant. One day after class, SL saw defendant and stopped to talk. Defendant asked to see her class folder and suddenly took off running with it. SL followed him into the theater room. Once inside, SL asked where her folder was, and defendant pointed to a nearby bathroom. SL went inside the bathroom and retrieved her folder. When she turned around, defendant was standing in front of the closed bathroom door. He began

8

kissing and touching SL all over her body. When SL told him to stop, he said, "It's okay. Don't worry about it." SL broke free and started to walk away, but defendant grabbed her by the hips and pulled her to the sink, where he pinned her throat against the wall with his arm so that she was unable to move. As he unzipped her pants, SL "freaked out" and pushed him as hard as she could. She remembered that he had a condom. She called for help, told him to "fuck off," and told him she did not want to do it. At that point, he stopped. SL reported the attack to her mother, the school principal, and the police.

When LK was six or seven years old, she was placed with her four siblings in foster care with the Mitchell family. On the first night she arrived, defendant came into her room while she slept, pulled down her pants and underwear, and orally copulated her. After several minutes, he left the room. He committed similar acts on several other nights until LK was eventually placed with her grandmother.

*M. The Verdict*

The Riverside County District Attorney charged defendant with 10 counts: oral copulation or sexual penetration of a child 10 years old or younger (count 1) (Pen. Code, § 288.7, subd. (b), unlabeled statutory citations refer to this code); unlawful sodomy or sexual intercourse with a person who is 10 years old or younger (counts 2 & 3) (§ 288.7, subd. (a)); aggravated sexual assault upon a child who is under the age of 14 and seven or more years younger than the defendant (counts 4-6) (§ 269, subd. (a)(1)); lewd and lascivious acts on a child under the age of 14 (counts 7, 8 & 10) (§ 288, subd. (a)); and lewd and lascivious act on a child who is under the age of 14 by force, violence, menace or duress (count 9) (§ 288, subd. (b)(1)). They also charged defendant with committing a

9

qualifying sex offense against more than one victim, which enhances the punishment for predicate offenses to a term of 15 years to life. (§ 667.61, subd. (e)(4).) According to the information, he committed counts 1 through 7 against CL, count 8 against DA, and counts 9-10 against TF.

The jury found defendant guilty of counts 1, and 3 through 10, but acquitted him of count 2. They also found he committed the qualifying sex offenses against more than one victim.

*N. The Sentence*

The probation department recommended sentencing defendant to 145 years to life. The judge followed the recommendation and imposed a sentence consisting of a term of 25 years to life for committing sodomy or intercourse with a child 10 years old or younger (count 3) and consecutive terms of 15 years to life for each of the other eight counts. The court ordered him to pay victim restitution to CL in the amount of $300,000, to DA in the amount of $50,000, and to TF in the amount of $100,000. Finally, the court ordered him to pay up to $1,095 for a presentence report, $541.58 for booking fees, and a criminal conviction assessment of $270.

Defense counsel argued that because defendant was a young offender, between 18 and 23 years old at the time of the offenses of conviction, a sentence of 145 years to life would constitute cruel and/or unusual punishment unless the court crafted a sentence that would make him eligible for parole after approximately 25 years. Counsel offered two alternative routes to a constitutional sentence. "One option would be to make [defendant] eligible for a parole hearing under the Youthful Offender act. [That would] require, at a

minimum, striking the [section] 667.61 enhancement, and any other provision that exclude[s defendant] from the youthful offender act. The second method would be to impose a sentence that makes him eligible for parole in his early 40's. This might involve running all sentences in this matter concurrently. Both approaches require the court to vary from provisions of the code, either by finding that the exclusion of sexual offenders from the youthful offender [act] violates equal protection and due process, or by finding that the application of the sentencing mandates of the Penal code, if applied to [defendant], would violate the 8th Amendment of the United States Constitution."

The trial court agreed a sentence of 145 years to life would be cruel and unusual, stating, "I agree with you 100 percent that that would be inappropriate if that, in fact, was the sentence in a nutshell, so to speak, but we know that given some recent legislation there's now a youthful offender, early parole hearing if you want to call it that, that I believe the defendant is entitled to, and [defendant] would be afforded such an early parole hearing given his age at the time of these offenses.

"And we should—we'll note on the record . . . that I believe he does qualify for a youthful offender parole hearing. Whether it's 15, 20, 25, up to the prison board to decide that issue. So—and that's based upon the *Edwards*[4] holding exception wherein under the law, the sex offenses don't qualify for that youthful parole hearing. *Edwards* says no, they do. It would be inappropriate and a violation of due process and equal

---

[4] *People v. Edwards* (2019) 34 Cal.App.5th 183 (*Edwards*), overruled by *Williams*, *supra*, 17 Cal.5th at page 137, footnote 12.

protection to not afford [defendant] the same kind of hearing someone convicted of murder would get.

"I will say there's one caveat. That there's another case out of a different district, [*People v. Williams* (2020) 47 Cal.App.5th 475], that I believe is in front of the Supremes where the ultimate decision will be made. So, I mean, stay tuned. The law could change. That would be out of my hands. That's above my pay grade. That's at the Cal Supreme level. If they decide, no, the—those individuals who are, in fact, convicted of these types of sexual offenses should not be afforded a parole hearing, youthful offender parole hearing, I can tell you if that's their ruling, I would still impose the sentence that I'm about to impose so I don't get a remittitur back or something on habeas back saying, well, Judge, we're not clear on what you have done given the new change in the law.

"So the sentence I'm going to impose is consistent with the statute, it's consistent with what happened. And it's consistent with what Probation is recommending. I don't see any reason to vary from the recommendation. These are very serious crimes with multiple victims over a lengthy period of time. I'm not talking about a single incident with one person, but these are many in nature and serious in nature." After sentencing defendant to the term of 145 years to life, the trial court scheduled a *Franklin* hearing, which is designed to give offenders an opportunity to make a record of factors, including youth related factors, relevant to the eventual parole determination. (*People v. Franklin* (2016) 63 Cal.4th 261, 286.)

12

## II. DISCUSSION

Defendant raises the following issues: (1) his sentence violates his equal protection rights because, as a One Strike offender, he is excluded from section 3051 relief; (2) his sentence constitutes cruel and unusual punishment; (3) trial court erred in ordering restitution to his three victims; (4) the restraining orders are unauthorized; and (5) the order imposing a presentence probation report and booking fees must be vacated.

### A. *Equal Protection*

Defendant committed his offenses when he was an adult between the ages of 18 to 24. As discussed, the trial court sentenced him to a term of 145 years to life, comprised of a base term of 25 years to life on one count and eight consecutive terms of 15 years to life as a One Strike offender. On December 6, 2022, this court reversed defendant's sentence on the grounds the statutory exclusion of One Strike offenders from access to a youth-offender parole hearing after 25 years violates their right to equal protection under the law. (*People v. Mitchell* (Dec. 6, 2022, E076032) review granted, opn. vacated, Jan. 22, 2025, S278038 (*Mitchell*).)

The Supreme Court granted review and deferred action pending its decision in *Williams*, *supra*, 17 Cal.5th 99. Following its decision in *Williams*, the Supreme Court transferred the matter back to this court with directions to vacate our prior decision and decide the matter in light of *Williams*. In *Williams*, the Supreme Court affirmed the constitutionality of section 3051, subdivision (h)'s exclusion of One Strike offenders from youthful offender parole consideration as compared to non-special-circumstances murderers and habitual sexual offenders. (*Williams*, at pp. 125-137.)

13

In light of *Williams*, both parties concede, and we agree, defendant is foreclosed from challenging his sentence on equal protection grounds. (*Williams*, *supra*, 17 Cal.5th at pp. 125-137; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450.)

*B. Cruel and/or Unusual Punishment*

In his opening brief, defendant argued the imposition of a de facto life without parole sentence on a young adult offender like him violates the proscriptions against cruel and unusual punishment. "In California, a punishment can be unconstitutional 'if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' [Citation.] 'Only in the rarest of cases' should a court declare unconstitutionally lengthy a sentence 'mandated by the Legislature.' [Citation.]" (*People v. Ellis* (2024) 105 Cal.App.5th 536, 550.)

In response, the People maintain defendant's sentence does not constitute a violation of the proscription against cruel and/or unusual punishment. Nonetheless, they note the trial court's sentencing order is less than clear. Initially, the court seemingly agreed the prescribed term would constitute cruel and unusual punishment if it were imposed. Later, the court recognized the California Supreme Court may resolve the equal protection challenge against defendant, and if that occurred, the court stated it would still sentence him to the same term given the seriousness of his multiple crimes. Acknowledging the sentence "could exceed [defendant's] life span," the court added, "I will say I do hope he gets his parole hearing. I recognize he was young, and I hope that

14

the Cal Supremes rule consistent with the *Edwards* decision and holding that he should be entitled to that, much like anyone convicted of a murder charge would be."

Considering the trial court's contradictory statements, the People assert "[i]t is difficult to reconcile these conflicting statements. It seems that the trial court was focused largely on the equal protection assertions, but it is difficult to understand how the trial court could agree that the sentence would constitute cruel and unusual punishment and yet allow the sentence to stand." Thus, the People requested a limited remand under section 1260 "to allow the trial court to clarify the record and address in the first instance whether the sentence constitutes cruel and/or unusual punishment." They reiterated this position in their supplemental letter brief filed January 29, 2025. Defendant concurs. Since the parties are in agreement, we shall vacate defendant's sentence and remand the matter to the trial court for a determination as to whether defendant's term of imprisonment (145 years to life) constitutes cruel and/or unusual punishment.

On remand, defendant is entitled to a full resentencing. As his case is not yet final, he is entitled to changes in the determinate sentencing laws that may apply to him. (*In re Estrada* (1965) 63 Cal.2d 740, 745 [when ameliorative legislation goes into effect, we generally presume the Legislature intends the benefits of the new enactment to apply as broadly as constitutionally permissible to all nonfinal cases]; *People v. Esquivel* (2021) 11 Cal.5th 671, 679 [the test for finality is "whether the criminal prosecution or proceeding as a whole is complete"].)

*C. Restitution*

The probation report recommended defendant pay $300,000 in restitution to CL, $50,000 to DA, and $100,000 to TF. The report states CL was "greatly affected" by the abuse, had trouble sleeping, and attended counseling to "move on with her life." The probation officer could not reach the other two victims but opined "it is likely they may require extensive counseling after seemingly being stripped of their innocence. Further, something as traumatic as these incidents could surely cause trust issues with future relationships." The report indicates that under section 1202.4, subdivision (f)(3)(F), certain sexual abuse victims are entitled to restitution of noneconomic losses, including psychological harm for violations of section 288, and the probation officer "believed all three victims suffered psychological harm as the result of the defendant's assaultive actions." To calculate the award amount, the probation officer used the formula set out in *People v. Smith* (2011) 198 Cal.App.4th 415, 437, namely, $50,000 times the number of years of abuse.

At the sentencing hearing, the trial court asked whether either side wanted to make any points on the question of victim restitution; both sides submitted without argument or objection. The court then ordered restitution in the amounts recommended in the probation report.

Defendant asserts the trial court erred in ordering restitution to his three victims. He claims the award to CL was unauthorized because the statute sanctions restitution for noneconomic injuries only for violations of section 288, section 288.5, and section 288.7 (§ 1202.4, subd. (f)(3)(F)), and there is no evidence DA and TF suffered any

16

psychological or emotional trauma.  The People argue defendant forfeited these assertions by failing to object at the time restitution was imposed.

Since we are vacating the judgment and remanding the matter for a full resentencing, the trial court has jurisdiction to revisit its prior sentencing decisions, including the imposition of these restitution fines.  Defendant's failure to object to the restitution fine at the first sentencing hearing does not forfeit his ability to object at the resentencing hearing.  (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425; *People v. Nilsson* (2015) 242 Cal.App.4th 1, 34 [remand for full resentencing includes "terms, fines, fees, and restitution"]; *People v. Rosas* (2010) 191 Cal.App.4th 107, 117 ["[T]he matter of the restitution and parole revocation fines is most assuredly not severable from the sentencing issues that were sent back to the trial court upon the first appeal"].)

*D.  No-Contact Orders*

The trial court ordered that defendant have no direct or indirect contact with CL, DA, and TF; however, it did not limit the duration of the restraining orders.  Defendant contends the restraining orders are unauthorized because they are limited by statute to a term of 10 years at the discretion of the trial court.  (§ 136.2, subd. (i)(1); *People v. Mancebo* (2002) 27 Cal.4th 735, 758.)  We agree.

"When a criminal defendant has been convicted of a crime involving domestic violence, as defined in Section 13700 or in Section 6211 of the Family Code, a violation of subdivision (a), (b), or (c) of Section 236.1 prohibiting human trafficking, Section 261, 261.5, former Section 262, subdivision (a) of Section 266h, or subdivision (a) of Section 266i, a violation of Section 186.22, or a crime that requires the defendant to register

17

pursuant to subdivision (c) of Section 290, the court, at the time of sentencing, shall consider issuing an order restraining the defendant from any contact with a victim of the crime. The order may be valid for up to 10 years, as determined by the court." (§ 136.2, subd. (i)(1).) Since defendant's conviction requires registration as a sex offender, the trial court was permitted to impose a restraining order protecting his victims for up to 10 years.

The People concede the restraining order would be unauthorized if the trial court imposed it under section 136.2, subdivision (i)(1), but argue the court had broader authority to protect the victims as percipient witnesses under section 136.2, subdivision (i)(2), which places no explicit time limit on the restraining order, but does allow its imposition "if it can be established by clear and convincing evidence that the witness has been harassed, as defined in paragraph (3) of subdivision (b) of Section 527.6 of the Code of Civil procedure, by the defendant." They argue defendant's convictions establish he harassed the victim-witnesses—because he sexually abused them—and therefore allowed the trial court to impose an indefinite restraining order protecting the witnesses.

We disagree with this interpretation. Without deciding whether a restraining order properly issued under section 136.2, subdivision (i)(2), may be permanent or of indefinite duration, we conclude the provision allows the trial court to protect witnesses who have been the subject of harassment because they have knowledge of the case. It is not sufficient to establish the witnesses were subject to sexual abuse as victims. Since nearly all victims of domestic and sexual violence have knowledge of the events, to interpret the

18

statute as the People suggest would make a nullity of the 10-year limitation on restraining orders that protect victims, set out separately in section 136.2, subdivision (i)(1). (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 719 ["Courts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage"].)

We therefore conclude the trial court erred by imposing a permanent restraining order on defendant. Because the statute requires the court to exercise discretion and impose a restraining order up to 10 years, we agree with defendant that the proper remedy is to send the issue back so the court may exercise its discretion. Accordingly, on remand, the court is directed to exercise its discretion and impose a restraining order up to 10 years.

### D. *Presentence Report and Booking Fees*

The trial court ordered defendant to pay the costs of preparing a presentence probation report under Penal Code section 1203.lb not to exceed $1,095 and booking fees under Government Code section 29550 in the amount of $514.58. Defendant argues, and the People concede, that this order must be vacated because the statutory authority for imposing these costs and fees has been repealed. We agree.

Assembly Bill No. 1869 (2019-2020 Reg. Sess.) amended the Penal Code by adding section 1465.9, which provided, "On and after July 1, 2021, the balance of any court-imposed costs pursuant to Section . . . 1203.lb . . . shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Stats. 2020, ch. 92, § 62.)  The same bill added Government Code section 6111, which provides "(a) On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to . . . Section 29550 . . . is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."  (Stats. 2020, ch. 92, § 11.)  These two provisions require the vacatur of the order imposing such fees.  (*People v. Clark* (2021) 67 Cal.App.5th 248, 260.)

## III.  DISPOSITION

We vacate defendant's sentence, including all fees and fines imposed, and remand with directions for the trial court to determine whether a term of 145 years to life, comprised of a base term of 25 years to life on one count and eight consecutive terms of 15 years to life as a One Strike offender constitutes cruel and/or unusual punishment. The court shall allow for a full resentencing that complies with the views expressed in this opinion and any ameliorative legislation enacted during the pendency of defendant's appeal.  In all other respects, we affirm the judgment.

Upon completion of resentencing, the trial court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

FIELDS
J.

MENETREZ
J.

21